**WESTINGHOUSE ELECTRIC CORPORATION et al., Appellants,**

v.

**CITY OF BURLINGTON, VERMONT, et al., Appellees.**

**No. 18582.**

United States Court of Appeals District of Columbia Circuit.

Argued Dec. 2, 1964.

Decided June 9, 1965.

age actions which had been brought in the Federal courts against several manufacturers of electrical equipment, including appellants.[2] These actions were brought in the wake of the Government's criminal actions against these manufacturers in 1960.

■■ The records that were demanded in connection with the subpoena may be described generally as complaints by publicly or privately owned utilities or by associations of such utilities that manufacturers of electrical equipment were, or might have been, violating the antitrust laws with respect to the sale of such equipment during the period between January 1, 1948, and December 31, 1960. The reason for this demand was that such complaints, if there were any, might help establish a defense to the claims of plaintiff-appellees that they should recover damages for transactions beyond the four-year period of limitations because the defendants-appellants had "fraudulently concealed" the alleged conspiracy. Several Courts of Appeals, including this one, have held that the running of the four-year statute of limitations applicable to treble-damage antitrust suits, 15 U.S.C. § 15b, is tolled by fraudulent concealment on the part of the defendants. E. g., City of Burlington, Vermont v. Westinghouse Electric Corp., 215 F.Supp. 497 (D.D.C.1963), aff'd, 117 U.S.App.D.C. 148, 326 F.2d 691 (1964). One well established defense to a claim of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have known, that he may have had a cause of action. Since here many of the plaintiffs' claimed damages related to transactions which took place before the four-year period immediately preced-

Mr. William H. Dempsey, Jr., Washington, D. C., with whom Messrs. Francis M. Shea and Richard T. Conway, Washington, D. C., were on the brief, for appellants.

Mr. H. Robert Halper, Atty., Dept. of Justice, of the bar of the Supreme Court of Illinois, *pro hac vice*, by special leave of court, for appellee Attorney General of the United States. Asst. Atty. Gen., William H. Orrick, Jr., and Messrs. Lionel Kestenbaum and Arthur J. Murphy, Jr., Attys., Dept. of Justice, were on the brief, for appellee Attorney General of the United States.

No brief was filed on behalf of appellee City of Burlington, Vt.

Before WASHINGTON, DANAHER and McGOWAN, Circuit Judges.

WASHINGTON, Circuit Judge.

On January 20, 1964, appellants, defendants below, served upon a representative of the Attorney General of the United States a subpoena *duces tecum* directing the production of documents relevant to the trial of certain treble-damage antitrust litigation, which might be in the files of the Department of Justice.[1] The subpoena was issued as part of the "National Discovery Program" which had been devised to facilitate and expedite the more than 1800 treble-dam-

---

1. FED.R.CIV.P. 45(b) states:
 "A subpoena may also command the person to whom it is directed to produce the books, papers, documents, or tangible things designated therein; but the court, upon motion made promptly and in any event at or before the time specified in the subpoena for compliance therewith, may (1) quash or modify the subpoena if it is unreasonable and oppressive or (2) condition denial of the motion upon the advancement by the person in whose behalf the subpoena is issued of the reasonable cost of producing the books, papers, documents, or tangible things."

2. See Neal & Goldberg, *The Electrical Equipment Antitrust Cases: Novel Judicial Administration*, 50 A.B.A.J. 621 (1964).

ing the bringing of suit, the establishment by defendants that the plaintiffs or others had complained to the Justice Department of antitrust violations by the defendants would be highly relevant to the defense of this action. The fact that such complaints were made would also be relevant in the numerous similar treble-damage actions in other jurisdictions. Discovery of such documents might limit the plaintiffs' damages to those incurred within the four years immediately preceding suit.

On January 25, 1964, the Government filed a motion to quash the subpoena, on the grounds that the documents were protected from disclosure by the "informer's privilege," that in certain respects the subpoena sought irrelevant documents, and that the subpoena was unreasonable and oppressive. The court, after a hearing, granted the motion on the informer's privilege and oppressiveness grounds. This appeal followed.

While it is true that this court's review of District Court orders going to the scope of discovery is limited, we think that the District Judge abused his discretion, that his order should be set aside, and that the matter should be remanded for further proceedings. The lower court's action in quashing the subpoena was in our view "improvidently taken," and it "affected the substantial rights of the parties." Sher v. De Haven, 91 U.S.App.D.C. 257, 261, 199 F.2d 777, 781, 36 A.L.R.2d 937 (1952). We do not now hold that the broad subpoena sought by the defendants should be enforced; but we instruct the trial judge to reconsider, in the light of the principles outlined herein, the possibility of reaching an accommodation between the defendants and the Department of Justice.

## I.

After the District Court granted the motion to quash, defendants-appellants requested that the court add to its order a certification that the decision warranted appeal under 28 U.S.C. § 1292(b). The request was denied, and this appeal, under 28 U.S.C. § 1291, followed. Appellees moved to have the appeal dismissed on the ground that an order of a District Court quashing a subpoena in an action pending in that court is not a final order within the meaning of Section 1291.[3] By order of June 11, 1964, we denied the motion to dismiss, without prejudice to a renewal of the motion at the time of the argument of the appeal. Appellees renewed motion, and we must, as a preliminary matter, decide the point.

It is clear that ordinarily an order quashing a subpoena issued against a party in a case pending in the District Court in which the order was entered is not appealable. See Hoffa v. United States, 309 F.2d 680 (5th Cir.) cert. denied, 371 U.S. 878, 83 S.Ct. 147, 9 L.Ed. 2d 115 (1962).[4] There is a conflict of authority on the question of whether an order quashing a subpoena entered in a district other than the one in which the main case is pending is appealable. Compare Palmer v. Fisher, 228 F.2d 603 (7th Cir. 1955), with Horizons Titanium Corp. v. Norton Co., 290 F.2d 421 (1st Cir. 1961). In the latter case the order quashing the subpoena was held to be final and appealable. The *Horizons Titanium* result has been adopted in this jurisdiction without discussion. Machin v. Zuckert, 114 U.S.App.D.C. 335, 316 F.2d 336, cert. denied, 375 U.S. 896, 84 S.Ct. 172, 11 L.Ed.2d 124 (1963). See 4 MOORE, FEDERAL PRACTICE ¶ 26.37 [1.1.– 2–2] [hereinafter cited as MOORE], ap-

---

3. Section 1291 provides:
 "The courts of appeals shall have jurisdiction of appeals from all final decisions of the district courts * * * except where a direct review may be had in the Supreme Court."
 *Cf.* Groover, Christie & Merritt v. Lo Bianco, 119 U.S.App.D.C. 50, 336 F.2d 969 (1964).

4. The subpoenas in that case were issued at the request of the accused, and were directed to various Government officials. They were quashed. If the motion of a non-party to quash a subpoena is denied, the order must be regarded as final if effective appellate relief would otherwise be unavailable. See Covey Oil Co. v. Continental Oil Co., 340 F.2d 993 (10th Cir. 1965).

proving this result. The subpoena herein was sought as part of the National Discovery Program; it sought information that was of value to defendants in numerous treble-damage actions in other jurisdictions as well as the defendants in this jurisdiction. The issue here is whether this fact brings it within the reasoning of the *Horizons Titanium* decision.

In *Horizons Titanium* the order quashing the subpoena would have been unreviewable if an appeal from the order had not been allowed. That is not so clearly the case here. If the order quashing the appeal is held unappealable at this time, the defendants below could still present the issue to us in an appeal from the decision in the main case. This approach, however, overlooks the fact that numerous defendants in other jurisdictions, involved in the National Discovery Program, are also interested in this subpoena; and they may have no review of the decision as it affects them if we do not review it herein. We see no reason why their claim to prompt appellate review should rest on the decision of the defendants below (appellants in this case) whether or not to appeal from the final judgment in the main case. Furthermore, litigation may be terminated in other jurisdictions by the time an appeal in the main case is decided, if such an appeal is taken. The issues involved in the instant appeal are separable from the issues involved in the main case. Hence, we pass to a consideration of the present appeal on the merits.[5]

## II.

■ The Government contends that the subpoena should be quashed on the grounds that it is unreasonable and oppressive. FED.R.CIV.P. 45(b). The burden of proving that a subpoena *duces tecum* is oppressive is on the party moving for relief on this ground. 5 MOORE ¶ 45.05 [2]. The burden is particularly heavy to support a "motion to quash as contrasted to some more limited protection." Horizons Titanium Corp. v. Norton Co., 290 F.2d 421, 425 (1st Cir. 1961). The two affidavits submitted by appellees are not sufficient to bear this burden. Appellants have expressed their willingness to accept some reasonable effort by the Government, that would be less than a page-by-page search. The lower court, in these circumstances, should have sought some way to accommodate the interests of the defendants herein with the practical problems of searching the Government's voluminous files.[6] Nothing in the record suggests that the possibility of making a less than complete search was explored.[7]

5. Appellees note decisions in other circuits in which Courts of Appeals have dismissed Section 1291 appeals from District Court orders releasing transcripts of grand jury minutes. City of Philadelphia v. Westinghouse Elec. Corp., 210 F.Supp. 486 (E.D.Pa.1962), appeal dismissed, Nos. 14296 and 14319, 3d Cir. Feb. 21, 1963; Atlantic City Electric Co. v. A. B. Chance Co., appeal dismissed March 21, 1963; see also 313 F.2d 431 (2d Cir. 1963). We think those decisions are distinguishable. They are analogous to an order refusing to quash a subpoena, not to an order quashing a subpoena. The difference is important. If a subpoena is not quashed, the subpoenaed party has a remedy in the jurisdiction where the action is pending (a motion to exclude). But if a subpoena is quashed, the party seeking the subpoena has no way to raise the issue in the jurisdiction where the action is pending.

6. In Wirtz v. Baldor Electric Co., 119 U.S. App.D.C. 122, 133, 337 F.2d 518, 529 (1963), we stated that "the traditional function of the courts in such a situation [is] to see that the fullest possible evidence, consistent with any privilege which the Government could properly claim, was made available for the proper decision of the controversy."

7. Indeed, the hearing on the motion to quash was held on January 27, 1964, *before* the two affidavits contained in the record were filed. At the hearing Government counsel conceded that "perhaps the defendants are very right for chastising us for not filing a lengthy affidavit stating our particularized reasons for alleging burden." The court gave the Government leave to file additional affidavits after the hearing. The affidavit originally filed does not appear in the record on appeal. It appears that no further hearings were held after the new

■■ On this record we cannot sustain the trial court's holding that the subpoena is oppressive and burdensome. The District Court should explore the matter fully in an effort to accommodate the interests of the defendants and then consider whether this subpoena is so oppressive that it cannot be granted, even in a modified form.[8] Perhaps a partial search could be attempted to determine how productive and how onerous a search of the complete file would be. The two brief affidavits filed by the Government, after the hearing on the motion to quash, were insufficient to establish that the subpoena was unreasonably burdensome and oppressive.

■■ The fact that these are very important cases with large sums of money at stake is relevant in determining the reasonableness of the subpoena. Even though the subpoena is addressed to a non-party, inconvenience occasioned by compliance with the subpoena is not a sufficient reason to quash. Cf. Pathe Laboratories, Inc. v. Du Pont Film Mfg. Corp., 3 F.R.D. 11 (S.D.N.Y.1943); 5 MOORE ¶ 45.05 [2]. Since the subpoena is addressed to an officer of the United States, it might be difficult to require appellants to bear the cost of the search; but the paramount interest of the Government in having justice done between litigants in the Federal courts militates in favor of requiring a great effort on its part to produce any documents relevant to a fair termination of this litigation.

### III.

The Government also argues that the informer's privilege supports the trial judge's decision to quash the subpoena. We think that the Government conceives the privilege too broadly. Our conclusion is based in large part on the Supreme Court's discussion of the privilege in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

At the outset, it is important to recognize that *Roviaro* considerably changed the character of the privilege. Prior to the decision of that case, the informer's privilege was broadly conceived and frequently considered an "absolute" one, as was stated in the leading case of Vogel v. Gruaz, 110 U.S. 311, 4 S.Ct. 12, 28 L.Ed. 158 (1884):

> "Public policy will protect all such communications absolutely, and without reference to the motive or intent of the informer or the question of probable cause. * * *
>
> * * * * * *
>
> " * * * The principle laid down * * * was, that it is the duty of every citizen to communicate to his government any information which he has of the commission of an offence against its laws; and that a court of justice will not compel or allow such information to be disclosed, either by the subordinate officer to whom it is given, by the informer himself, or by any other person, without the permission of the government, the evidence being excluded not for the protection of the witness or of the party in the particular case, but upon general grounds of public policy, because of the confidential nature of such communica-

---

affidavits were introduced on January 31, 1964; hence, there was no attempt made to meet the defendants' needs in the light of the information provided by the Government in its affidavits.

8. It would be appropriate for the trial judge to be sure that the defendants had made full use of discovery procedures against the plaintiffs. Such discovery might lighten the load on the Justice Department. But the fact that discovery from the plaintiffs was or was not productive would not bar the issuance of a subpoena against the Government. The most thorough discovery from other sources would not necessarily reveal what is in the Government's files. For example, an officer of one of the plaintiffs might have made an oral complaint to the Justice Department. The only memorandum of it might be in the Government files. Taking the deposition of the officer would obviously be no substitute for searching the Government files. Nor is the subpoena limited to complaints to the Department made by plaintiffs.

tions." 110 U.S. at 315–316, 4 S.Ct. at 14–15.

See also In re Quarles and Butler, 158 U.S. 532, 15 S.Ct. 959, 39 L.Ed. 1080 (1895); Arnstein v. United States, 54 App.D.C. 199, 296 F. 946 (1924). Cf. Boeing Airplane Co. v. Coggeshall, 108 U.S.App.D.C. 106, 113, 280 F.2d 654, 661 (1960).[9]

 The significance of the *Roviaro* decision goes beyond the specific context in which it arose. The approach taken in the *Vogel* and *Arnstein* cases is virtually abandoned. *Roviaro* establishes several points: (1) Only the identity of the informer is privileged. The content of the communication is not privileged unless it would tend to reveal the identity of the informer. And once the identity is revealed, the privilege terminates. (2) Although the matter was not explicitly decided, it would seem from this opinion that an informer can waive the privilege. Once he identifies himself as an informer the privilege disappears. It is difficult to see how the Government could prevent him from revealing himself, practically or theoretically, or why, as a matter of policy, it would want to do so. The court notes that the "informer's privilege is in reality the Government's privilege." 353 U.S. at 59, 77 S.Ct. at 627. Whatever the reality referred to is, this statement can scarcely mean that only the Government can waive the privilege; we read it as meaning that the privilege exists for the benefit of the general public, not for the benefit of the particular informer involved. It would not follow from this that the informer cannot voluntarily waive the privilege. (3) The applicability of the privilege is for the court to decide after the privilege is invoked by a witness. (4) Most important, *Roviaro* rejects the theory that the privilege *guarantees* the informer's anonymity. The opinion imports a "fairness" concept and states that a court must balance competing interests in reaching its decision on privilege:

"We believe that no fixed rule with respect to disclosure is justifiable. The problem is one that calls for balancing the public interest in protecting the flow of information against the individual's right to prepare his defense. Whether a proper balance renders nondisclosure erroneous must depend on the particular circumstances of each case, taking into consideration the crime charged, the possible defenses, the possible significance of the informer's testimony, and other relevant factors." 353 U.S. at 62, 77 S.Ct. at 628.

The *Roviaro* opinion restates the policy behind the informer privilege:

"The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." 353 U.S. at 59, 77 S.Ct. at 627.

The purpose of the privilege is not to protect the particular informer from retaliation, but to protect the flow of information to the Government. However, it rests on the assumption that a citizen, recognizing the risk of retaliation, will be more likely to inform if he knows that his identity will be kept secret. The privilege is maintained to encourage possible informers in the future by giving them some assurance of anonymity.[10] To

---

9. Some other courts took a narrower view of the privilege (see, *e. g.*, United States v. Krulewitch, 145 F.2d 76, 156 A.L.R. 337 (2d Cir. 1944, per L. Hand, J.), but it was not until *Roviaro* that the informer's privilege received a thorough reexamination.

10. The cases applying a balancing test have recognized the possible risk of retaliation against the particular informer as a factor to be taken into account. See, *e. g.*, Durkin v. Pet Milk Co., 14 F.R.D. 385, 390 (W.D.Ark.1953); Boeing Airplane Co. v. Coggeshall, *supra*. Con-

the extent that the *Roviaro* balancing test becomes known to potential informers, it will adversely affect the policy for which the privilege exists. *Roviaro* states that in a wide range of cases, the privilege will not preclude disclosure, if indeed the Government chooses to invoke it at all. If requirements of "fairness" to the defendant demand it, the informer's identity will be revealed. The *Roviaro* case stops far short of guaranteeing the anonymity of informers. If potential informers really have relied on the assurance of anonymity in the past, *Roviaro* should be expected to decrease the flow of information to the Government while exposing those who do inform to a greater risk of public identification. *Roviaro* thus strikes a new balance between the need of litigants for information possessed by the Government and the need of the Government to foster the flow of information provided to it.

An additional risk of disclosure under *Roviaro* might also be noted where the information is given in a commercial context. Should the information provided by the informer become relevant in a civil suit brought by the informer or someone else, the informer himself would be subject to discovery. Since only the identity of the informer, not the content of the communication, is privileged and the privilege is waived once his identity becomes known, it is difficult to see how the informer could escape disclosure of his informing were his deposition taken.[11] Thus there is an additional block to the anonymity of the informer.

While the *Roviaro* balancing test does not do away with the informer privilege, it significantly weakens it as a reason for excluding relevant evidence and limiting discovery accordingly.

Appellee argues that the *Roviaro* standard would never justify disclosure in civil cases in which the Government is not a party. But the fact that the case is civil rather than criminal is not dispositive. Cf. Machin v. Zuckert, *supra*. The policies behind the privilege and its exceptions extend to civil as well as criminal cases. Presumably most informers do not want their names to be revealed in either a civil or criminal proceeding. The fact that there would be a somewhat greater chance, statistically, of having their identity revealed if disclosure is required in civil cases would be unlikely to deter citizens from informing. There is no logical reason to set up two different privileges, one for civil and one for criminal cases. The defendant in a criminal case may have a greater stake than a party in a civil case, but that would not always be so: even admitting the probability of a greater risk of retaliation in a criminal case. The *Roviaro* balance should be struck in each case, civil and criminal, in deciding whether disclosure "is essential to a fair determination of a cause." 353 U.S. at 61, 77 S.Ct. at 628. *Roviaro* has been cited as stating the proper formulation of the informer privilege in numerous civil cases since it was decided. See, e. g., Mitchell v. Bass, 252 F.2d 513, 516 (8th Cir. 1958); Henrik Mannerfrid, Inc. v. Tee-

---

ceptually, this is relevant only insofar as disclosure in a situation where there is a high risk of retaliation might deter informers in the future.

11. The pre-*Roviaro* case of United States v. Deere & Co., 9 F.R.D. 523 (D.Minn. 1949), illustrates this point. Defendant in a civil antitrust suit brought by the Government sought from the Government answers to questionnaires made by defendant's former dealers and returned by them to the Government. Defendant knew the identity of the dealers involved. The court found that the contents of the communications were privi-

leged, citing *Vogel* and *Arnstein*. This ground for decision is no longer available, since *Roviaro* states that only the identity of informers is privileged. In the *Deere* case, the identity of the former dealers was known. Under the *Roviaro* decision the Government would probably have to disclose the information. It is quite clear that the informing dealers would have to tell the defendant as much about their informing as they were able to if the defendant deposed them individually. If they claimed the privilege, their identity as informers would be known and the privilege lost.

garden, 23 F.R.D. 173, 175–776 (S.D.N.Y. 1959). The approach taken by the Supreme Court follows that taken in Rule 36 of the Uniform Rules of Evidence and Rule 230 of the Model Code of Evidence, neither of which distinguishes between civil and criminal cases. See, also, 4 MOORE ¶ 26.25 [6.-2]. Furthermore, a treble-damage action is not wholly a private civil action. The statute permitting such actions is designed to make private parties prosecutors. The judgment is punitive as well as compensatory. And the plaintiffs often rely heavily on the conviction in the previous criminal action. 15 U.S.C. § 16. Nor is the fact that the Government is not a party to the suit decisive.[12] The policy of assuring "a fair determination of a cause," 353 U.S. at 61, 77 S.Ct. at 628 applies with equal force whether or not the Government is a party.[13]

█ In applying the *Roviaro* standard to any documents produced and claimed to be privileged the trial judge should consider the claim as it relates to each document.

█ We think that the judge below erred in relying on the informer's privilege as a ground for quashing the entire subpoena. It is not clear whether there are any documents at all in the Government's files fitting the descriptions in the subpoena. If there are, they might fall into several different classes: documents relating to complaints by plaintiffs in this suit; those relating to complaints by others; documents that are relevant in themselves and do not reveal the identity of the informer; documents not themselves material but which might lead to material information; information supplied by corporations since dissolved. The possible kinds of documents which might be in the Government files could be well-nigh infinite. These are only a few of the classifications that might be relevant to a judge's decision on whether or not to require production of a particular document. Professor Moore states that a "claim of privilege must normally be directed toward specific documents so that the court can rule intelligently thereon." 5 MOORE ¶ 45.05 [1] at 1721–22. See also In the Matter of Chopnick, 6 FED.RULES SERV. 45b.413, Case 1 (S.D. N.Y.1942). Documents which are claimed to be privileged should normally be produced for inspection by the judge *in camera*. 5 MOORE ¶ 45.05 [2] at 1723–24. On remand, this procedure should be followed.

In our view information provided to the Justice Department by the plaintiffs in this treble-damage action should be treated differently from information provided by non-parties. The plaintiffs in this case should be regarded as having waived the informer's privilege as to their communications with the Government relating to alleged offenses underlying their treble-damage action. In this case plaintiffs have not stated that they were informers. They have, however, taken a position sharply adverse to that of the defendants. Treating this suit as

---

1-2. Courts have authorized discovery by defendants in private antitrust suits of the minutes of grand jury hearings in certain circumstances, even though the Government objected and was not a party. 4 MOORE ¶ 26.25 [5.-1] at 1567. See, e. g., In Matter of Special 1952 Grand Jury, 22 F.R.D. 102 (E.D.Pa. 1958); cf. Atlantic City Electric Co. v. A. B. Chance Co., 313 F.2d 431 (2d Cir. 1963). See also note 5, *supra.*

13. It is true that the Government has the option of dropping an action rather than disclosing the identity of an informer where it is bringing suit. This, however, has little to do with the policy of the in-

former privilege, to encourage citizens to become informers. The fact that at some time in the future the Government might drop an action rather than reveal the informer's name is unlikely to make more people informers; and the fact that the Government might not have that option in some situations is unlikely to inhibit informing. In addition, it might be noted that the decision on disclosure in any case is to be made by a judge. In cases in which for some reason the Government is particularly zealous of protecting an informer, it is safe to suppose that a judge would sympathetically consider its argument.

a waiver of privilege by any plaintiff shown in fact to have been an informer would not significantly inhibit treble-damage actions or the flow of future communications of this sort to the Government. Hence, in the case of any such plaintiff, the privilege should be regarded as waived. Cf. Olympic Refining Co. v. Carter, 332 F.2d 260 (9th Cir.), cert. denied, 379 U.S. 900, 85 S.Ct. 186, 13 L. Ed.2d 175 (1964).

The fact that this is an antitrust case is relevant. Plaintiffs had a greater incentive to inform than does a private citizen in an ordinary case. Plaintiffs were customers of defendants, and they stood to benefit directly from a cessation of the activities complained of. See *Carrow, Governmental Nondisclosure in Judicial Proceedings,* 107 U.Pa.L.Rev. 166, 180–81 (1958). Furthermore, if the Government obtains a conviction against defendants in a criminal action, the plaintiffs' task in a subsequent treble-damage action is made much easier, since the criminal conviction is prima facie evidence of violation in the treble-damage action. 15 U.S.C. § 16. Hence, those who are in a position comparable to plaintiffs herein have other incentives to inform, in addition to the limited assurance of anonymity provided by the informer's privilege. The risk that this source of information will dry up is thus decreased. Contrast Machin v. Zuckert, *supra.*

We also note that plaintiffs have by bringing suit subjected themselves to civil discovery. Clearly they would have to give such information related to past informing as they have available. Information that they no longer had available might still be in the Government files. No policy is furthered by permitting the Government to suppress information which the plaintiffs would have had to disclose. The Government asserts that a private party cannot waive the Government's privilege. But an informer can waive the privilege by simply identifying himself.

IV.

In considering the documents or classes of documents claimed to be privileged, the trial judge should weigh their relevance to possible defenses, the seriousness of this litigation, the possible significance of the informer's information, and other relevant factors. In considering the public interest in protecting the flow of information to the Government the court should bear in mind that no informer can ever be certain of anonymity and that the informer in antitrust matters has material incentives to give information, in addition to his general concern for the public welfare.

The order of the District Court quashing the subpoena is reversed and the matter is remanded for further proceedings not inconsistent with this opinion.

So ordered.