**CITY OF BURLINGTON, VERMONT, Plaintiff,**

v.

**WESTINGHOUSE ELECTRIC CORPORATION et al., Defendants.**

**Civ. A. No. 348-62 and related cases.**

United States District Court
District of Columbia.
Oct. 21, 1965.

H. Robert Halper, Attorney, Department of Justice, Washington, D. C., for Department of Justice before this Court.

William H. Dempsey, Jr., of Shea & Gardner, Washington, D. C., and John Logan O'Donnell and William Sondericker, of Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Westinghouse Electric Corporation et al.

No appearance was entered for City of Burlington in this matter.

SIRICA, District Judge.

The Court has before it for reconsideration a motion filed by the Attorney General of the United States, through his attorney, to quash a subpoena *duces tecum* served upon his representative on January 20, 1964. The subpoena requests the production of certain documents at a deposition proceeding which was to have been conducted on January 27, 1964, as part of the National Discovery Program in connection with the electrical equipment antitrust cases.[1] In general, the documents sought consist of every letter, memorandum or other written communication, and all notes, memoranda, or other records of each oral communication, during the period between January 1, 1948, and December 31, 1960, which were made to or which are under the control of the Department of Justice, in which any distributor of electricity, group of distributors, or engineering consultant or firm thereof, or any officer, agent or employee of the same, complained, alleged, suggested or otherwise asserted that there may have been price fixing or other violations of the antitrust laws in the electrical equipment industry.[2]

■ The defendants are seeking to obtain information from the Department of Justice files which might indicate knowledge on the part of the plaintiffs that a conspiracy to violate the antitrust laws existed for more than four years before the plaintiffs filed their treble damage actions. This information is sought in order to establish a defense to the plaintiffs' claims that they should recover damages for transactions occurring beyond the four year period of limitations[3] because the defendants have fraudulently concealed the alleged conspiracy. This Court, and our Court of Appeals, have held that the running of the four year statute of limitations applicable to treble damage antitrust suits is tolled by fraudulent concealment on the part of the defendants. See City of Burlington, Vermont v. Westinghouse Electric Corp., 215 F.Supp. 497 (D.D.C. 1963), aff'd, 117 U.S.App.D.C. 148, 326 F.2d 691 (1964). Since one recognized defense to an allegation of fraudulent concealment is that the plaintiff knew, or by the exercise of due diligence could have known, that it may have had a cause of action, the documents requested may be relevant to the disposition of claims in hundreds of treble damage actions pending throughout the country which involve large sums of money.

On February 14, 1964, this Court entered an order quashing the defendants' subpoena *duces tecum* on the grounds that it was burdensome and oppressive, and that the documents sought were protected by the informer's privilege, as defined in Roviaro v. United States, 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957). An appeal was taken from this order to the United States Court of Appeals for this Circuit wherein it was reversed and the case was remanded to this Court for further proceedings.[4] In reversing, the Court of Appeals stated:

> The lower court's action in quashing the subpoena was in our view "improvidently taken," and it "affected the substantial rights of the parties."[5]

■ While the construction placed upon Roviaro by our Court of Appeals dif-

1. For the background of the electrical equipment cases and the procedures devised for dealing with them, see Report of the Co-Ordinating Committee for Multiple Litigation of the United States District Courts, a Sub-committee of the Committee on Pretrial Procedure and Practice of the Judicial Conference of the United States (Sept. 1, 1965); Neal & Goldberg, The Electrical Equipment Antitrust Cases: Novel Judicial Administration, 50 A.B.A.J. 621 (1964).

2. The subpoena and the schedule of documents requested are set out in Appendix A.

3. 15 U.S.C. § 15b (1955).

4. Westinghouse Electric Corp. v. City of Burlington, Vermont, D.C.Cir., June 9, 1965, 351 F.2d 762.

5. Id. 351 F.2d at 762.

fered from its interpretation by this Court, the word "improvidently" appears to mean much more than legal error. The Court feels that this word conveys the impression that the Court's action was taken without proper consideration of the questions involved and the importance of the case. Webster defines "improvidently" as meaning "Not provident, wanting foresight or forethought; not forseeing or providing for the future; negligent; thoughtless; thriftless." [6] A judgment, decree, rule or injunction is improvidently granted when rendered "without adequate consideration by the court, or without proper information as to all the circumstances affecting it, or based upon a mistaken assumption or misleading information or advice." [7]

While this Court welcomes an interpretation of Roviaro by our Court of Appeals, it cannot agree with that Court that its action in quashing the subpoena was "improvidently taken." When the Court decided that defendants' subpoena should be quashed, it had given considerable thought and attention to the rights of all of the parties. At that time, numerous electrical equipment cases were pending before this Court with discovery in progress. Furthermore, pretrial proceedings had been taking place in the City of Burlington case, in which a trial of more than two months' duration was subsequently held.[8] In addition, this Court has cooperated with the Co-Ordinating Committee for Multiple Litigation, which was established by the Judicial Conference of the United States, as a Sub-committee of its Committee on Pre-Trial Procedure and Practice, to deal with the complex problems raised by the hundreds of electrical equipment antitrust cases. This Court has followed the work of the Sub-committee with great interest, and since March of 1962, has attended seven meetings of the Judges before whom electrical equipment cases were pending. Moreover, this Court has presided over many deposition proceedings in connection with the National Discovery Program instituted by the Sub-committee. Consequently, when the Court entered its order that the defendants' subpoena be quashed, it was well aware of the importance of the electrical equipment cases generally, and of this subpoena in particular. Prior to its decision, this Court heard oral argument by both the defendants and the Department of Justice and in reaching its decision, gave most careful consideration to both the arguments and the memoranda and authorities submitted by the parties in support thereof. This Court was ever conscious of the effect its decision on this motion would have upon the electrical equipment cases throughout the country. On the other hand, the Court was also cognizant of the precedent which might be set by allowing a wholesale examination of Government files. It was only after a most thorough consideration of all the factors involved and the issues raised that the Court concluded that the public interest in encouraging the free flow of information to law enforcement officials outweighed the interest of the defendants in obtaining the documents they sought. Furthermore, the Court feels that its decision to grant the motion to quash the subpoena was proper at the time it was made, in view of the Court's narrow interpretation of Roviaro.

In an attempt to comply with the mandate of the Court of Appeals, the Court has held two hearings. At these two hearings, the question of the extent of the search to be undertaken by the Department of Justice was discussed, along

---

6. Webster, New International Dictionary of the English Language, 1253 (2d ed. 1957)

7. Black, Law Dictionary, 891 (4th ed. 1957).

8. City of Burlington, Vermont v. Westinghouse Electric Corp., No. 348–62, D.D.C., 1964, 215 F.Supp. 497. The trial commenced on October 6, 1964 and concluded on December 16, 1964, with a judgment for the plaintiff in the amount of $504,-000.

with the contentions of both parties as to the applicability of the informer's privilege. As a result of these hearings and a search of its files undertaken by the Department of Justice, certain documents have been submitted to the Court for an *in camera* inspection. In addition, memoranda have been submitted by both sides outlining their respective positions as to what classes of documents should, or should not, be turned over to the defendants. However, before the Court indicates which, if any, of these documents should be disclosed, it will set forth the guidelines it has followed in reaching its decision.

 The term informer's privilege is actually a misnomer. This privilege is really the Government's privilege to withhold from disclosure the identity of persons who furnish the Government with information as to violations of the law.[9] It is intended to protect the Government's sources of information and thereby facilitate the administration and enforcement of the law. By preserving the anonymity of persons who furnish information to the Government and thus protecting them from reprisal and resentment, the privilege recognizes, and encourages the fulfillment of, the obligation of every citizen to cooperate in the enforcement of the law, and consequently, in the preservation of an ordered society.

At one time, the informer's privilege was considered to be an absolute one. To quote the Supreme Court of the United States:

> [I]t is the duty of every citizen to communicate to his government any information which he has of the commission of an offense against its laws; and * * * a court of justice will not compel or allow such information to be disclosed, either by the subordinate officer to whom it is given, by the informer himself, or by any other person, without

the permission of the government * * *.[10]

The absolute nature of this privilege has subsequently been rejected by the United States Supreme Court. In Roviaro v. United States, supra, the Court, while recognizing the existence of the policy behind the privilege, pointed out that the scope of the privilege is limited by its underlying purpose.

> Thus, where the disclosure of the contents of a communication will not tend to reveal the identity of an informer, the contents are not privileged. Likewise, once the identity of the informer has been disclosed to those who would have cause to resent the communication, the privilege is no longer applicable.

> A further limitation on the applicability of the privilege arises from the fundamental requirements of fairness. Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way.[11]

However, the Court expressly refused to enunciate a fixed rule with respect to disclosure. It indicated, and our Court of Appeals has reiterated, that the problem is one that calls for a balancing of the interest of the Government in encouraging the free flow of information to law enforcement officials with the individual's need for information possessed by the Government.

Roviaro provides helpful assistance in resolving problems in the area of informer's privilege. It does not, however, completely solve these problems. Roviaro was a criminal case, wherein the defendant sought to discover the name of an informer to whom the defendant had allegedly sold narcotics in violation of 26 U.S.C. § 2554(a). During the course of the trial, the informer's part

9. Roviaro v. United States, 353 U.S. 53, 69, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957).

10. Vogel v. Gruaz, 110 U.S. 311, 316, 4 S.Ct. 12, 15, 28 L.Ed. 158 (1884).

11. 353 U.S. at 60–61, 77 S.Ct. at 627, 628.

in the transaction was described but the informer was not produced, identified, or otherwise made available. The informer was the sole participant, other than the accused, in the transaction alleged. He was the only witness in a position to amplify or contradict the testimony of Government witnesses. Obviously, in order to prepare his defense it was necessary for the defendant to obtain the identity of the informer. And since the only source of this information was the Government, fairness required disclosure.

■ Our Court of Appeals has indicated that Roviaro imports a "fairness" concept, making more flexible what was once a mechanical rule. Although Roviaro was a criminal case, the Court of Appeals has indicated that its significance goes beyond the specific context in which it arose. However, while Roviaro stops far short of guaranteeing the anonymity of informers, this Court does not read that opinion as requiring disclosure in every case in which a defendant maintains that a search of Government files and the disclosure of the identity of Government informers would assist him in his defense. While the principles outlined in Roviaro must now, at least in this Circuit, be broadly applied, this Court will neither permit nor demand a wholesale revelation of informers' identities. Although the distinction between civil and criminal cases may not of itself be controlling in deciding whether the informer's privilege should apply, it is the opinion of this Court that some showing of necessity must be made similar to that appearing in Roviaro, before disclosure should be ordered.

Since Roviaro was based on a concept of fairness, it is incumbent upon this Court to determine whether under the facts of this case, "fairness" requires disclosure of the documents for which the privilege is claimed, and thereby to strike a proper balance between the needs of the litigants for information possessed by the Government and the Government's desire to encourage the flow of information to it.

■ First, let us discuss the Government's position. There can be no disputing the fact that complaints from citizens, corporations, associations and other organizations are necessary for the effective administration of the law. It is the purpose of the informer's privilege to facilitate this private cooperation in law enforcement, by encouraging informers to provide pertinent information to the Government without fear of public exposure. These considerations apply as well to the antitrust laws as to any other area of law enforcement. As stated by Judge Nordbye in United States v. Deere & Co., 9 F.R.D. 523, 526 (D.Minn.1949):

> Without the anti-trust laws and resulting actions to enforce them, monopoly would strangle competition and threaten the Nation's economic well-being. Encouraging such information from the citizenry on such matters is just as important and emphatic as encouraging information of violations of the criminal laws of the Nation. The public interest and welfare is the object of protection.

There are innumerable reasons why a person might hesitate to become an informer for the Government, ranging anywhere from a well-founded fear of retaliatory violence at one extreme to a vague uncertainty about possible social disfavor at the other. However, the motive behind reluctance is not controlling. If for any reason a potential informer does not wish to have his identity disclosed, and he therefore withholds information, then the result is an impairment of law enforcement. To quote from Roviaro:

> The purpose of the privilege is the furtherance and protection of the public interest in effective law enforcement. The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crime to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation.

 Defendant Westinghouse maintains that disclosure of the identity of informers as to antitrust violations is less likely to curtail the Government's flow of information than it would in other areas. This is because the incentive to inform in antitrust cases is said to be increased by the possible cessation of the activities complained about as a result of Government action, and by the facilitation of private treble damage actions after the Government obtains a conviction. The Court was aware of this factor before it quashed the subpoena *duces tecum* in the first instance and has given it considerable thought at this time, but does not consider it controlling. The mere fact that the Government might possibly make use of information supplied to it to lessen the burden cast upon a complainant by alleged illegal activity, while certainly an incentive to inform in any instance of illegal activity, does not appear sufficient in itself to encourage the degree of private cooperation necessary, especially in light of the uncertainties of the law enforcement process. Moreover, it would seem that the policy is to encourage information from all sources, not just from those who would be benefited by Government action. The same reasoning applies to the private use of Government-obtained convictions. Certainly, these convictions are of great assistance to any complainant interested in bringing suit and constitute an incentive to inform, but the Court did not, and does not feel that this consideration constitutes a *sufficient* incentive. There can be no questioning the fact that the vast majority of complaints and investigations do not culminate in suits by the Government. Without the additional shield of anonymity, the Court did not and does not now feel that these incentives are of sufficient weight to encourage that cooperation which is necessary for the enforcement of the antitrust laws. The Court does not mean to intimate that the commercial factors outlined herein are not significant in many instances. Indeed, where a complainant has filed suit there is considerable reason to believe that his complaint was influenced by these factors. However, the Court is unwilling to hold that such considerations should be controlling in every case since the effect of such a holding would be virtually to eliminate the informer's privilege from the antitrust area. The Court does not feel that such a result is demanded or justified by Roviaro. It is then, the opinion of the Court that in the antitrust area there remains considerable reason to protect the Government's sources of information from undesired disclosure.

 On the other hand, it is apparent now, as it was when the order quashing the subpoena was entered, that there are substantial sums of money involved in the electrical equipment litigation throughout the country and that the documents sought may be of considerable importance to the defendants in preparing their defense to the allegation of fraudulent concealment. The defendants, as indicated earlier, would like to establish that the plaintiffs, or some of them, knew, or by the exercise of diligence should have known, of the alleged conspiracy for more than four years prior to the institution of the actions. This Court did previously, and does now, consider the fact that plaintiffs and others complained to the Department of Justice as being relevant to the defense interposed. Complaints by the plaintiffs are obviously relevant, especially those made more than four years before they instituted their actions. While the Department of Justice urges that communications by plaintiffs within this four year period are irrelevant,[12] the Court feels that such communications might provide a valuable lead in interrogating those plaintiffs further as to when their suspicions were first aroused or as to whether they entertained any like suspicions with respect to prior periods of time.

12. The actions were brought in 1961. The Department of Justice thus contends that complaints after 1957 should not be disclosed.

The Government contends that complaints of identical bidding as to what it calls "shelf items" [13] have no probative value, even if collusion is alleged, if the complaint is based solely on the fact of identical bidding. The Court cannot agree with this contention. Discovery need not relate to evidence admissible in and of itself. If a party has complained of an antitrust violation on the grounds of identical bids, it would certainly be relevant to discover if that party's belief may have been based also on other evidence and to determine whether the complainant had made a thorough investigation of the matter upon which the complaint was based. Moreover, as the defendant points out, it is not up to this Court to determine what weight a jury should give to a complaint based upon identical bids in determining whether a particular plaintiff knew, or by the exercise of due diligence could have known, that it may have had a cause of action.

Now that the needs of the respective parties have been outlined, we must proceed to examine how a balance should be struck between them. According to Roviaro, there are certain instances in which the informer's privilege does not apply. The underlying purpose of the privilege precludes its application where the identity of the informer has been disclosed to those who would have reason to resent his complaint.[14] In this connection, our Court of Appeals has stated that:

> [I]nformation provided to the Justice Department by the plaintiffs in this treble-damage action should be treated differently from information provided by non-parties. The plaintiffs in this case should be regarded as having waived the informer's privilege as to their communications with the Government relating to alleged offenses underlying their treble-damage action.[15]

The Court of Appeals is of the opinion that once a complainant has filed suit, he has revealed his identity and subjected himself to civil discovery, and that the Government should not be permitted to withhold information which the plaintiffs themselves would have had to disclose. Information no longer available to the plaintiffs might be in the files of the Department of Justice and should be produced. This same reasoning would apply to complaints by plaintiffs relating to product categories other than those in which they brought suit. Furthermore, there is no suggestion by the Court of Appeals that its holding with respect to waiver by the institution of litigation was not to apply to plaintiffs who managed either to settle their claims or to conclude trials before the Court of Appeals decided the privilege question. This Court must assume that the Court of Appeals was aware that many cases had already been disposed of by the time of argument. Accordingly, it is the opinion of this Court that, under the decision of the Court of Appeals, the Department of Justice must turn over to the defendants copies of, or allow the defendants to inspect, examine, and make copies of, all letters, memoranda and other written communications and all notes, memoranda or other records of oral communications, which are covered by the subpoena and which relate to complaints by persons, corporations, etc., which are, or were at any time, plaintiffs in the electrical equipment cases. However, this does not mean that the defendants will have access to any Federal Bureau of Investigation reports. The Court feels that the public interest in encouraging cooperation with the Federal Bureau of Investigation and in protecting the results of their investigations from scrutiny, outweighs the defendants'

---

13. "Shelf items" would include equipment not made to individual specifications such as watthour meters, lightning arresters, and bulbs.

14. See 353 U.S. at 60, 77 S.Ct. 623, 1 L. Ed.2d 639.

15. Westinghouse Electric Corp. v. City of Burlington, Vermont, supra, D.C.Cir., 351 F.2d 762.

interest in their production. Furthermore, the Court feels that through an examination of the plaintiffs' correspondence and files, and by the use of the federal discovery procedures, the defendants can obtain the information they seek. The conclusions and opinions of the Federal Bureau of Investigation are not necessary for the preparation of the defendants' case.

As to complaints by persons who never became plaintiffs, the Court feels that there are additional factors which must be taken into consideration. No doubt these documents may lead to evidence relevant to the defense asserted against the fraudulent concealment charge. Nonetheless, neither the Supreme Court nor the Court of Appeals has held that the informer's privilege is inapplicable in the antitrust area, but as indicated before, the question now is the proper balance in this particular case. Complaints from those who were never plaintiffs are being sought in order to obtain information about the plaintiffs. It is the defendants' theory that deposing these non-plaintiff complainants might show that they discussed their complaints, or some other aspect of the alleged price fixing with some or all of the plaintiffs in these actions. As indicated earlier, the Court recognizes the value of such strategy. However, the Court believes that within the meaning of Roviaro, these documents are not essential and should not be produced. If there were no other way to obtain information concerning the activity or knowledge of the plaintiffs, disclosure of complaints by these third parties might be proper. While production by the Department of Justice of these third-party complaints might save the defendants considerable work and expense, this Court believes that the same information can be obtained from the plaintiffs themselves. Moreover, the Court feels that absent compelling circumstances which would render non-disclosure unfair, a complainant should be able to determine for himself whether his name should be disclosed. Such a determination would be made, as the Court of Appeals has indicated, by a decision to bring suit, or by some other form of waiver.

In the instant case, there is no basis for a determination that the non-plaintiff complainants have waived their anonymity. Further, the Court cannot find any necessitous circumstances which would render non-disclosure unfair. On the other hand, the Court feels that to deny the informer's privilege in the case of these complainants would be setting a dangerous precedent. If it were established that in future civil cases of this kind, the Department of Justice might be compelled to reveal the identity of non-plaintiff complainants, solely on the ground that such disclosure would be helpful, a fear of exposure could develop which would hinder law enforcement. In the present case then, the Court is of the opinion that the public interest in encouraging the free flow of information to the Government, and in the enforcement of our laws, far outweighs the defendants' need for these particular documents in establishing their defense.

Counsel will submit an appropriate order.

## APPENDIX A

### CIVIL SUBPOENA

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

Civil Action No. 348–62 and related cases (see Pre-Trial Order No. 25)

The City of Burlington, Vermont, Plaintiff

v.

Westinghouse Electric Corporation et al., Defendants

To: Robert F. Kennedy, Attorney General of the United States, Department of Justice, Washington 25, D. C.

YOU ARE HEREBY COMMANDED to appear in Courtroom 16 at the United States Court House in the City of Washington, D. C. to give testimony in the above-entitled cause on the 27th day of January, 1964, at 10:00 o'clock a. m. (and

bring with you) the documents listed on the Schedule of Documents attached hereto.

Harry M. Hull, Clerk.
By J. M. Proctor
Deputy Clerk.

(Seal)

Date January 20, 1964.

Richard T. Conway
Attorney for Defendant
General Electric Co.

## SCHEDULE OF DOCUMENTS

1. Each letter, memorandum or other written communication, and all notes, memoranda or other records of each oral communication, during the period between January 1, 1948 and December 31, 1960, made to or under the control of the Department of Justice, in which any utility company, governmental body, cooperative or other organization engaged in the generation or distribution of electricity (including any officer, agent, employee or person acting or purporting to act on behalf of such utilities, governmental bodies, cooperatives and organizations):

(a) complained, alleged, suggested or otherwise asserted that any manufacturer or supplier of electrical equipment [1] (including any officer, agent, employee or person acting or purporting to act on behalf of such manufacturers or suppliers) has been, may have been, is or may be violating the antitrust laws with respect to prices, pricing rules, terms or conditions of sale of any type of electrical equipment or with respect to the classification of items of any types of electrical equipment as standard or non-standard;

(b) complained, alleged, suggested or otherwise asserted that two or more such manufacturers or suppliers of electrical equipment have been, may have been, are or may be agreeing, combining, conspiring or otherwise engaging in concerted action with respect to prices, pricing rules, terms or conditions of sale of any type of electrical equipment or with respect to the classification of electrical equipment as standard or non-standard;

(c) complained, alleged, suggested or otherwise asserted that any such manufacturer or supplier of electrical equipment communicated in any way at any time with any other such manufacturer or supplier of electrical equipment with respect to prices, pricing rules, terms or conditions of sale of any type of electrical equipment or with respect to the classification of items of any types of electrical equipment as standard or non-standard; or

(d) complained, alleged, suggested or otherwise made assertions about the lack of difference between prices quoted or bid by different manufacturers or suppliers for any purchase or series of purchases of electrical equipment or about uniformity of manufacturers' or suppliers' pricing practices or terms or conditions of sale in regard to any such purchase or series of purchases.

2. Each letter, memorandum or other written communication, and all notes, memoranda or other records of each oral communication, during the period between January 1, 1948 and December 31, 1960, made to or under the control of the

---

[1]. As used in this schedule, the term "electrical equipment means hydrogenerators, steam turbine generators, power transformers, bushings or bushing accessories, circuit breakers, condensers, distribution transformers, industrial control equipment, insulators, isolated phase buses or isolated phase bus structures, distribution lightning arresters or lightning arrester accessories used therewith, intermediate or station lightning arresters or lightning arrester accessories used therewith, arrester cut-out combination units, low voltage distribution equipment, low voltage power circuit breakers, meters, network transformers, open fuse cutouts or open fuse cutout accessories, power capicators, [sic] power switchgear assemblies, power switching equipment, navy or marine switchgear or equipment including any such products.

Department of Justice, in which any association, organization or group (including any section, committee or subcommittee thereof and any officer, agent, employee or person acting or purporting to act on behalf of such associations, organizations or groups) of utility companies, governmental bodies, cooperatives or officers or employees of utility companies, governmental bodies or cooperatives did any of the things referred to in subparagraphs (a) through (d) of paragraph 1 above.

3. Each letter, memorandum or other written communication, and all notes, memoranda or other records of each oral communication, during the period between January 1, 1948 and December 30, 1960, made to or under the control of the Department of Justice in which any engineering consultant or firm or organization of engineering consultants (including any officer, agent, employee or person acting or purporting to act on behalf of an engineering consultant or firm or organization of engineering consultants) did any of the things referred to in subparagraphs (a) through (d) of paragraph 1 above.