374 F.2d 295
 LOCAL 57, INTERNATIONAL LADIES' GARMENT WORKERS' UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent,
Garwin Corporation, S'Agaro, Inc., Joseph Winkelman and Milton Mirsky, Intervenors.
GARWIN CORPORATION et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
 No. 19478.
 No. 19624.
 United States Court of Appeals District of Columbia Circuit.
 Argued February 11, 1966.
 Decided January 11, 1967.
 Certiorari Denied June 5, 1967.
 See 87 S.Ct. 2074, 2078.
 COPYRIGHT MATERIAL OMITTED Mr. Max Zimny, New York City, of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Mr. Morris P. Glushien, New York City, was on the brief, for petitioner in No. 19478.
 
 Messrs. John A. McGuinn, Washington, D. C., and Joseph A. Perkins, Miami, Fla., with whom Mr. Guy Farmer, Washington, D. C., was on the brief, for petitioners in No. 19624 and intervenors in No. 19478.
 Mr. Lawrence M. Joseph, Atty., N.L. R.B., of the bar of the Court of Appeals of New York, pro hac vice, by special leave of court, with whom Messrs. Arnold Ordman, Gen. Counsel, N.L.R.B., Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Solomon I. Hirsh, Atty., N.L. R.B., were on the brief, for respondent.
 Before BASTIAN, Senior Circuit Judge, and BURGER and McGOWAN, Circuit Judges.
 BURGER, Circuit Judge:
 
 
 1
 Consolidated for review are a petition to set aside an order of the National Labor Relations Board, a petition to modify the order, and a cross-petition by the Board for enforcement of its order. The petitions involve what is known colloquially as a "runaway shop." The Board found that the employer closed its plant in New York City, discharged its employees, and moved operations to Miami, Florida, for the purpose of depriving the New York employees of rights guaranteed under Section 7 of the National Labor Relations Act and to avoid dealing with the Union in violation of § 8(a) (5), (3) and (1) of the Act.[1] An additional violation of § 8 (a) (5) and (1) was found in the failure to consult with the Union concerning the decision to move to Miami.
 
 
 2
 The Employer, Garwin Corporation, claims in its review petition that the Board's findings are not supported by substantial evidence and that the Board's remedy is improper. The Union contends the Board's remedy is inadequate. The Board seeks enforcement.
 
 
 3
 Until 1963 Garwin manufactured women's swimwear in its New York plant. Its key personnel in that year were: Joseph Winkelman, president and sole stockholder; Milton Mirsky, in charge of products control; and Vera Maniaci, designer and production manager.
 
 
 4
 In July 1963, S'Agaro of Florida was incorporated with Mirsky as president. Winkelman, although not an officer of S'Agaro, was found by the Trial Examiner to have participated fully in its operation and to have directed its efforts; Maniaci was designer and production manager. S'Agaro was capitalized with money drawn from Garwin, carried on substantially identical operations, including production of many of the same lines, and operated with some of the office and factory equipment moved from the New York plant to Florida.
 
 
 5
 On the basis of these and other factors, the Trial Examiner concluded, and the Board agreed, that the Florida corporation, S'Agaro, was the alter ego of Garwin. Garwin argues, however, that it was completely liquidated and that there were more differences in the operation of S'Agaro and Garwin than similarities. That there was a formal termination of Garwin, however, hardly settles the matter of whether its business operations were continued in the form of S'Agaro. With respect to this, the Trial Examiner's finding that S'Agaro was the alter ego of Garwin is abundantly supported by substantial record evidence.
 
 
 6
 While it is now clear that an employer may terminate his business for any reason,[2] it is equally well settled that he may not transfer its situs to deprive his employees of rights protected by Section 7.[3] Given that S'Agaro was a continuation of Garwin, the next question for the Examiner was the motive for the move. The Examiner found the company had closed its New York plant and moved operations to Florida because of its opposition to the employees' exercise of their rights under the Act and because of an animosity toward the Union, thus violating Sections 8(a) (1), (3), and (5)
 
 
 7
 The Examiner based his finding of discriminatory motivation on direct evidence of antiunion bias and hostility, on concealment from the union of plans for the move, and on the inadequacy of the economic explanations offered by the Company. The Board adopted the Examiner's findings.
 
 
 8
 As to the first basis, the record discloses that despite constant friction between the Union and the company, including apparently illegal Union demands, the company did not invoke the contract's arbitration provisions. Winkelman was explicit in his testimony before the Trial Examiner about his feelings toward the Union. He told of warning his associate Mirsky that
 
 
 9
 they come at you like a strong arm boy, there is no sense to this, no reasoning behind the union, and anything that you did with the union is wrong because they are nothing but strong arm boys, * * * and if it's possible down here [Florida] to stay out of their clutches * * * as long as possible. * * *
 
 
 10
 He further testified what he had told a Union accountant:
 
 
 11
 I told him that I lost my lease, that I was darned well fed up with the union terrorism and activities and that had been going on and that I no longer intended to go along with it any more because I had lost my main source of revenue from Modern Jr's only because of them, that they were deleterious in their efforts.
 
 
 12
 There was also testimony that Maniaci told an employee in December 1963, after the move had been effected, that "the main reason was that Mr. Winkelman wanted to get out of the union."
 
 
 13
 The Company does not point to any countervailing evidence ignored by the Trial Examiner but argues that it was perfectly reasonable for Winkelman to feel this way in light of the "coercive and threatening tactics engaged in by agents of the Union." But the cause of Winkelman's attitude toward the Union is irrelevant. The law does not permit an employer to flee the bargaining agent because of hostility to it; other procedures are available to him to rectify such grievances.
 
 
 14
 Evidence of concealment of plans for the move from the union is likewise clear. The decision to move had crystallized at least by May 1963 and in that month Winkelman wrote, "I am very interested in finding a factory * * * in Hialeah or any other part of the area. * * *" About this time a Union business agent heard rumors of the move but was told by Maniaci, who conducted labor affairs, that Garwin was looking for another location "in the area" (New York).[4]
 
 
 15
 Garwin's main contention on appeal is that the record demonstrates that it was spurred to move because of economic pressures and that even if there were also some antiunion animus, the "preponderant" motive was economic. Since the Trial Examiner found that there was only one reason for the move — antiunion sentiment — and rejected claims of economic necessity, this is not a case where we need to pass on what standard should be applied if the two motives are found to co-exist.
 
 
 16
 The record amply supports the Trial Examiner's finding that there was no genuine economic motivation independent of the hostility toward the union. Garwin enjoyed substantial operating profits in the last two years of operation in New York. In July 1963 Garwin lost one of its accounts, which it claimed was an important factor in its operations, but, while the company claimed this would result in financial loss, it presented no clear evidence of the relative importance of this line. Garwin relied on the testimony of Winkelman that this was his "only money making account," but the Trial Examiner rejected this since he found Winkelman a generally unreliable witness. This was within his province. Winkelman's self-serving testimony thus discredited, Garwin points to nothing which would demonstrate that the Trial Examiner's finding was without basis.[5] Moreover, the record discloses that the decision to move had already been made before this account was lost in July.[6] Nor does Garwin explain why the loss of one account, no matter how harmful to the company, would be the type of economic consideration that would justify a transfer of operations. To justify a move as being economically motivated, the transfer must be calculated to cure the difficulty; no causal nexus between the claimed economic considerations and the move are shown here.
 
 
 The Board's Remedy
 
 
 17
 To redress the injuries occasioned by this "runaway," the Board ordered the Employer to offer full reinstatement to its workers and to compensate them for any loss of earnings resulting from the discrimination against them. It further ordered the employer to bargain with the Union either at the New York plant, if it returned there,[7] or at the new Florida location, irrespective of whether the Union had majority status.
 
 
 18
 The essence of the remedy fashioned by the Board is that the new employees in Florida are compelled to accept the Union as their bargaining agent for one year since the "runaway" employer is not directed to return to New York or likely to do so and since the remedy is premised on the New York workers not moving to Florida.
 
 
 19
 At issue is the appropriateness of requiring the company to bargain with the Union in Florida as the legal representative of employees who have not selected this Union and who are strangers to it. That these Florida workers are not before us asserting their legally protected right to freedom of choice of a bargaining agent is not controlling. Indeed their very absence indicates the need for this court to carefully scrutinize the Board's remedy.
 
 
 20
 The Board reasoned that this remedy was necessary to deprive the company of the "fruits" of its illegal acts — i. e., escape from the New York union. Although the Examiner acknowledged that this remedy impinged on "the rights of new employees innocent of wrongdoing," the Board concluded that "on balance" the Florida employees' Section 7 right to choose their own bargaining representative (or to have none at all)[8] "must yield to the statutory objective of fashioning a meaningful remedy for the unfair labor practices found." We disagree. We find it difficult to see genuine meaning in a "remedy" which is essentially negative in character and smacks of punitive action.
 
 
 21
 The Board has always been conceded wide discretion in the fashioning of remedies for unfair labor practices, but the remedies must be such as to "effectuate the policies" of the Labor Act.[9] "The Board's order will not be disturbed `unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act.'"[10] The Board argues that the remedy in this case is proper since it restores the status quo by removing from the company the benefit of its misdeeds. However, an examination of the purpose of this doctrine and an analysis of the record of this case demonstrate that, as applied here, the remedy does not effectuate a policy of the Act and indeed violates one of the Act's most basic policies, i. e., employee freedom to select a bargaining agent. Many battles have been fought to establish this basic right as law.
 
 
 22
 The Board is indeed correct when it states that the purpose of a remedy must be restoration of the status quo to the greatest extent practicable; however the basic purpose of restoring the status quo is to redress the injury done to employees. See, e. g., Local 60, United Brotherhood of Carpenters and Joiners v. NLRB, 365 U.S. 651, 81 S. Ct. 875, 6 L.Ed.2d 1 (1961); Frank Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct 817, 88 L.Ed. 1020 (1944); Phelps Dodge Corp. v. NLRB, supra; Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). This principle is crucial here.
 
 
 23
 The Board has traditionally required an employer to bargain with an established union which loses its majority because of the employer's unfair labor practices.[11] In Franks Bros. Co. v. NLRB, supra, the Supreme Court upheld a Board order that a company guilty of an unfair labor practice must bargain with the incumbent union even though the union had lost its majority status not directly as a result of the illegal act of the company but due to normal labor turnover occurring during the adjudication of the company's wrongdoing. The Court noted the Board's fear that requiring a union to maintain its majority "during delays incident to hearings would result in permitting employers to profit from their own wrongful refusal to bargain." 321 U.S. at 704, 64 S.Ct. at 818.
 
 
 24
 Underlying Board compulsory bargaining orders is an eminently reasonable principle: those workers who have voted for a representative should not have their choice cancelled out by an employer's unfair labor practice. If a union loses its majority because some workers were coerced or because the company wrongfully refused to bargain with it, restoration of the status quo calls for Board recognition of the Union. A compulsory bargaining order in such circumstances is merely a recognition of the earlier vote of the workers, which is reasonably presumed to represent a more accurate reflection of their sentiments than the later vote, colored if not distorted by the company's illegal conduct. If the union majority is lost after an unfair labor practice because of a normal labor turnover during the period of the subsequent litigation, only slightly different considerations are involved. The Board may reasonably conclude that the employer's prior illegal act could similarly discourage union membership of new workers entering the bargaining unit.
 
 
 25
 The crucial element in all these cases is that the interest being protected is the freedom of choice of the workers in a bargaining unit. The compulsory bargaining order is intended to put into effect what these workers had voted. Even when the majority of the plant vote against the union after an unfair labor practice and the swing votes are cast by new workers, a substantial number of the workers still in the unit had opted for the union when free to do so; there is, moreover, the additional factor that the later vote may have been tainted by the company's unfair labor practices. The suggestion in Franks, supra, that the Board could remove from the employer the benefit of its illegal act was merely the other side of the coin of making the injured employees whole.[12]
 
 
 26
 The right to choose a union and have that union operate in a climate free of coercion, which is the goal of Board compulsory bargaining orders, is a cornerstone of the National Labor Relations Act;[13] equally protected by the Act with the right of the workers to choose that representative is the right to have none. Yet the remedy fashioned by the Board in this case imposes on the Florida workers a bargaining representative without reference to their choice. Such an infringement of the Florida employees' Section 7 rights might be justified if some rights of the New York workers depended on that balancing[14] or if for some other valid reason the Board considered it necessary to promote industrial peace.[15]
 
 
 27
 The Board, however, justified its order only as being necessary to remove from the Employer the benefits of its wrongdoing. The hard question presented to us is whether this, standing alone and without relationship to redressing grievances of the New York workers, who suffered the violation of their statutory rights, is enough to justify infringing fundamental rights of comparable magnitude vested by law in the Florida workers.
 
 
 28
 The Board does not claim the bargaining order will restore to the New York workers their lost rights but, on the contrary, premised its remedial order on the assumption that few if any New York workers would accept reinstatement in Florida and, refusing to order the company to return to New York, decided that the New York workers would have to find their redress in back pay. The Board did not predicate its remedy on any finding that the unfair labor practices in New York precluded a free and untainted vote by the Florida workers.
 
 
 29
 There is one "boilerplate" clause in the Board decision referring to "the continuing coercive effects of [Garwin's] unfair labor practices." It is not clear whether the Board meant by this a continuing effect which would inhibit the New York workers from moving to Florida or an effect on the new employees in Florida. Even assuming the latter was intended, the remedy could not stand, for there is nothing in the record suggesting that the Florida workers were aware of what had occurred in New York. This is a different situation from that presented by new workers entering a bargaining unit at the original site — or near it — which still contains discriminatees. Secondly, the thrust of the Board's reference to the "continuing coercive effects" was not concern for those feeling the coercion but rather concern that Garwin would be successful in its flight from the union. This is putting the cart before the horse.
 
 
 30
 Were the Board engaging in a genuine balancing of the rights of newly hired workers against those of discriminatees whose places they took, we would allow it very wide scope.[16] But when, as in this case, the Board has acted to redress the New York workers' grievances and plans no further reparation for them, we find it difficult to see justification for a remedy which deprives Florida workers of a basic right without genuinely benefiting the injured workers in New York. Once it has been assumed that the New York workers will not migrate to Florida, the Board cannot fairly describe its action as a balancing of their rights against those of the Florida workers; at this point the New York workers are out of the picture, and denial of basic rights of the Florida workers simply does not effectuate the policies of the Act.
 
 
 31
 That the Board has deprived Florida workers of freedom of choice for only one year rather than two or three is hardly an answer if the right of choice is acknowledged.
 
 
 32
 The dissent views the deprivation of the rights of Florida workers as related to the purposes of the Act by the nexus of the Employers' "successfully evading their duty to bargain with the union." This seems to rest on an acceptance of the Board's power to "punish" the Employer by means which invade guaranteed rights of Florida workers and fails to accord freedom of choice its proper place. It also fails to insist on a proper balancing of rights. Nowhere does the dissent meet the point that "restoration of the status quo" means redress to the injured workers, not punishment of errant employers.
 
 
 33
 The remedy at issue is not entirely new; the Board has applied it to "runaways" where the move was of such a short distance that the Board could assume that, absent the unfair labor practices, workers would have followed the employer to the new site.[17] In these cases, the Board has required the company to bargain even if a substantial number does not follow the Employer. However, even though the Board has thus limited its application, this remedy has met with divided judicial response. The Ninth Circuit has upheld the Board's order that a company which had failed to bargain about a twelve-mile move must deal with the union as the workers' representative even if the union does not have a majority at the new location. NLRB v. Lewis, 246 F.2d 886 (9th Cir. 1957). But the Second Circuit refused, more recently, to enforce this remedy since the "Union does not appear to represent any of the employees in the [new] plant." NLRB v. Rapid Bindery, Inc., 293 F.2d 170, 177 (2d Cir. 1961). We consider this the sound view, at least as applied to the facts of this case.
 
 
 34
 The Board seeks to distinguish Rapid Bindery from the instant case by arguing that there was no hostility to the union shown in Rapid Bindery, as there is here.[18] We are not told, however, in what way the motivation for an unfair labor practice is relevant to a remedy which strikes at workers in order to inflict pain on an employer unless the Board is trying to punish an employer for his unlawful intent. If the Board is suggesting that this remedy is suitable because the Company has been hostile, it is making out a case that the order is not remedial but punitive. That is not a valid basis for an order.[19] The Board's attempted distinction also overlooks the fact that Employer animosity toward the union was present in Rapid Bindery, although the Court concluded that the record did not support the Board's finding that this was the preponderant motive for the move. Finally, there was no hostility to the union in Lewis, supra, where the Ninth Circuit affirmed the remedy. Employer motivation or attitudes toward the union hardly seem to be the touchstone of judicial response.
 
 
 35
 As final argument, the Board urges here that the remedy is necessary to deter other employers from fleeing union relationships and thus to protect statutory rights of employees generally, although this rationale was not suggested prior to filing the Board brief here. It has been established, however, that the purpose of Board remedies is to rectify the harm done the injured workers, not to provide punitive measures against errant employers. "[T]he power to command affirmative action is remedial, not punitive." Republic Steel Corp. v. NLRB, 311 U.S. 7, 12, 61 S.Ct. 77, 79, 85 L.Ed. 6 (1940). Deterrence alone is not a proper basis for a remedy. Ibid.; NLRB v. Coats & Clark, Inc., 241 F.2d 556, 561 (5th Cir. 1957). The Board argues that the order is permitted by Section 10(a), which allows the Board "to prevent any person from engaging in any unfair labor practice."[20] But it seems quite clear that this means the Board may stop an actively continuing unfair labor practice that has been discovered and adjudicated, as distinguished from a general deterrence of unfair labor practices.[21]
 
 
 36
 It is, of course, not our function or responsibility to fashion remedies for the Board and even our review of remedies is narrow. Our concern over the remedy here fashioned by the Board is that it deprives employees of a basic right of free choice on the theory that this is the best way — or at least a permissible way — to deprive the Employer of the fruits of his proscribed conduct.
 
 
 37
 In our view the Board should not seek to "discipline" the Employer at the expense of the new Florida employees.[22] Such a remedy is, on its face, arbitrary; the Board ought not rob Peter to punish Paul.
 
 
 38
 We remand the record to the Board for further consideration of this aspect of its remedy, in light of this opinion. In all other respects, the Board's order will be enforced.
 
 
 
 Notes:
 
 
 [1]
 61 Stat. 140-141 (1947), 29 U.S.C. § 158(a) (5), (3), (1) (1964)
 
 
 [2]
 Textile Workers Union of America v. Darlington Manuf. Co., 380 U.S. 263, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965)
 
 
 [3]
 Seeibid.; NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961); NLRB v. Winchester Electronics, Inc., 295 F.2d 288, 5 A.L.R.2d 726 (2d Cir. 1961).
 
 
 [4]
 In July, S'Agaro placed help-wanted advertisements in a Florida paper, but when Maniaci was again asked if Garwin was moving, she replied, "Well, we're making samples, does it look as though we're moving?" By this time, Maniaci herself had already received $1,000 from Garwin for "moving and relocation" expenses. In August, an employee discovered that the sewing machines had been removed from the New York plant; Maniaci and Mirsky assured her that Garwin was still "around" and "working." On Labor Day, the employees were informed that "the place had moved to Florida."
 
 
 [5]
 Garwin points out that its lease would expire later in 1963 and that it faced $13,000 extra rent if it renewed, but it shows nothing in the record indicating that it went to the substantial expense of moving to "save" that $13,000, that this was a reason for the move, or that it sought another plant within the area
 
 
 [6]
 The Company argues that this line would have been rendered unprofitable by union demands in March or April that it absorb a 7½ per cent payroll surcharge. But this is irrelevant. The very purpose of the Act is to allow unions to make demands, which the employer may resist but may not flee
 
 
 [7]
 The Board rejected the Union's contention that it should compel the Company to return to New York. This was not an abuse of discretion
 
 
 [8]
 National Labor Relations Act § 7, 61 Stat. 140 (1947), 29 U.S.C. § 157 (1964)
 
 
 [9]
 E. g., Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941); National Labor Relations Act § 10(c), 61 Stat. 147 (1947), 29 U.S.C. § 160(c) (1964).
 
 
 [10]
 Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964)
 
 
 [11]
 See,e. g., Franks Bros. Co. v. NLRB, supra; NLRB v. Delight Bakery, Inc., 353 F.2d 344 (6th Cir. 1965); Joy Silk Mills, Inc. v. NLRB, 87 U.S.App.D.C. 360, 185 F.2d 732 (1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951); NLRB v. Consol. Mach. Tool Corp., 163 F.2d 376 (2d Cir.), cert. denied, 332 U.S. 824, 68 S.Ct. 164, 92 L.Ed. 399 (1947).
 
 
 [12]
 See also National Licorice Co. v. NLRB, 309 U.S. 350, 60 S.Ct. 569, 84 L.Ed. 799 (1940)
 
 
 [13]
 See,e. g., Local Lodge No. 1424, IAM v. NLRB, 362 U.S. 411, 428, 80 S.Ct. 822, 4 L.Ed.2d 832 (1960).
 
 
 [14]
 See Franks Bros. Co. v. NLRB,supra.
 
 
 [15]
 Phelps Dodge Corp. v. NLRB,supra.
 
 
 [16]
 Franks Bros. Co. v. NLRB,supra; Phelps Dodge Corp. v. NLRB, supra, 313 U.S. at 195, 61 S.Ct. 845. The conclusion that the Board has deprived Florida workers of a basic statutory right in order to strike at the Employer does not lose its validity simply because the Employer has made this argument. In any event we hardly need the Employer's aid to see the fallacy of the Board's position.
 
 
 [17]
 Compare Calif. Footwear Co., 114 N.L. R.B. 765 (1955), enforced in partsub nom. NLRB v. Lewis, 246 F.2d 886 (9th Cir. 1957), with Industrial Fabricating, Inc., 119 N.L.R.B. 162 (1957), enforced sub nom. NLRB v. Mackenish, 272 F.2d 184 (6th Cir. 1959) and Mount Hope Finishing Co., 106 N.L.R.B. 480 (1953), enforcement denied, 211 F.2d 365 (4th Cir. 1954).
 
 
 [18]
 The Board also attempts to distinguishRapid Bindery on the ground that NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), represents Supreme Court disapproval of it. Katz, however, deals with a different situation — that of discriminatees remaining with the company.
 
 
 [19]
 Infra p. 303.
 
 
 [20]
 National Labor Relations Act § 10(a), 61 Stat. 146 (1947), 29 U.S.C. § 160(a) (1964)
 
 
 [21]
 Compare National Licorice Co. v. NLRB, 309 U.S. 350, 361-365, 60 S.Ct. 569, 84 L.Ed. 799 (1940), with NLRB v. Express Pub. Co., 312 U.S. 426, 435, 61 S.Ct. 693, 85 L.Ed. 930 (1941)
 
 
 [22]
 If the Board wishes to redress injury suffered by the Union as such it might well consider, for example, assessment on the Employer of an amount directed at reimbursing the Union for its loss represented by organizational expenses invested in the New York local; and if the Union seeks to organize the new Florida workers, the expense of a campaign there will be substantial. We are not told whether the Board has statutory authority to make such a monetary assessment against the Employer
 
 
 
 39
 McGOWAN, Circuit Judge (concurring in part and dissenting in part):
 
 
 40
 With all respect, I would affirm and enforce the Board's order as it stands. I am not unmindful of the majority's reluctance to accept the punishment of the guilty employer by a remedy which impinges to some degree upon the innocent Florida employees. But the extent to which the latter feel aggrieved by this circumstance is wholly speculative, since none of them are before us complaining of the deprivation of their freedom of choice which moves my brethren to circumscribe the Board in this instance.
 
 
 41
 * The question presented by this case involving the nature of the relief ordered by the Board is admittedly difficult. We have been beset by contentions in the sharpest possible conflict. The employer-petitioners assert that the order exceeds the limits of the Board's discretionary authority to fashion appropriate remedies for violation of the Act. The union strenuously argues that it does not go far enough. This divergence of opinion did not characterize the Board's deliberations, all of its members having joined in the prescription of the remedy.
 
 
 42
 The order in the first instance traverses familiar terrain, including the imposition of back pay liability until the New York employees who choose not to move to Florida obtain substantially equivalent employment. The order goes further, however, and requires petitioners upon request to bargain with the union, whether they remain in Florida or return to New York, without requiring the union first to reestablish its majority support. In order to preserve some flexibility with respect to the new Florida employees who might not wish continued representation by the Union, the Board relaxed its normal contract bar rules so that any contract resulting from the Board's bargaining order[1] would bar an election petition for only one year.
 
 
 43
 In so requiring petitioners to bargain with the union at their Florida plant, the Board modified the recommendations of the Trial Examiner. He had concluded, with visible reluctance, that, if petitioners decided to remain in Florida, prior Board doctrine limited the available remedy to requiring liability for backpay from the time of discharge, an offer of reinstatement at the Florida plant, and the payment of moving expenses to those accepting reinstatement.[2] But in so concluding he lamented the ineffectiveness of these traditional remedies in the circumstances of this case. In his view, it allowed the employer here to evade its statutory responsibilities with little, if any, adverse consequences. Requiring an offer of reinstatement in Florida seemed especially unsatisfactory since most of the employees were married women with ties to New York. Nor did backpay liability, in his view, constitute a significant factor, since the tight labor market in New York minimized the likelihood of substantial liability. Nevertheless, despite the concededly unsatisfactory nature of his recommended order, the Examiner regarded as too drastic the union's proposal that Garwin be required to resume business in New York.
 
 
 44
 In modifying the recommended order, the Board was concerned about the same factors that troubled the Examiner. In its view, the seriousness of the violations reflected in this record impelled a reexamination of Board remedial policy. Paramount in its concern was the need to fashion a remedy which would "remove any consequences of the unfair labor practices which enable the [petitioners] * * * to benefit from their unlawful course of conduct." Since the Board did not think it likely that Garwin's New York employees would accept employment in Florida, or that their failure to do so would result in any significant back-pay liability, conditioning recognition of the union at the new location upon the latter's establishing a majority was thought to enable petitioners with impunity "to achieve their primary illegal objective, i. e., to escape bargaining."
 
 
 45
 Nevertheless, the Board did not think it was necessary to achieve the statutory objectives at the cost of ordering a return to New York. In its view, the issuance of an effective bargaining order, which would frustrate Garwin's design to escape dealing with the union, would best serve the purposes of the Act. Whatever impact this order might have upon the interests of newly-hired Florida employees, those interests were thought rationally subordinate to the objective of providing an effective remedy for the unfair labor practices committed.[3]
 
 II
 
 46
 In deciding whether the present order is out of keeping with the statute, whether by going too far or by not going far enough, a reviewing court must be mindful of the broad language with which Congress has defined the Board's discretion. When the Board finds an unfair labor practice to have been committed, Section 10(c) of the Act authorizes it "to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this Act." This power, as has been recently emphasized, is "a broad discretionary one, subject to limited judicial review"; and its exercise is not to be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). See also NLRB v. Seven-Up Bottling Co., 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953); Phelps Dodge Corp. v. NLRB, 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941).
 
 
 47
 Garwin contends that on the facts of this case the order imposed is an abuse of discretion because it is likely to impose union representation upon a nonconsenting majority of the new Florida employees. This is said both to infringe the rights of these employees to refrain from engaging in concerted activities and to frustrate the policy of the Act against recognition of minority unions.[4] But I cannot view the interests of these employees in the absolute terms which petitioners ascribe to them. It is clear that an absence of majority status will not always defeat an order to bargain. See Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1943).[5] Upon a proper showing, competing considerations may override this claim. Ibid. Thus, the bounds of the statute are not automatically exceeded whenever there is a possibility that the bargaining representative is not the choice of a majority of the employees. Admittedly, our task does not end here when we determine that one policy of the Act has been subordinated in some degree to another Congressional purpose. We must go on to decide whether the particular accommodation of such policies made by the Board in response to the particular circumstances of this case fairly falls within the range of the Board's primary authority to effectuate the purposes of the Act. See, e. g., NLRB v. Seven-Up Bottling Co., supra.
 
 
 48
 In devising the remedy adopted, the Board obviously considered the desirability of this measure in the light of the effectiveness of its more usual responses. The problem of the "runaway" shop has long assailed the Board.[6] In the present case, the Board reexamined its policy and found it inadequate, at least in relation to an employer whose purpose to throw off its union obligations coincided with economic and geographic circumstances which minimized the penalty to be anticipated under the Board's usual approach. Because those measures would permit Garwin to retain the fruits of its unfair labor practices at slight cost, the Board determined to take additional steps to remedy the deliberate evasion of statutory responsibilities portrayed by this record. Ordering petitioners to bargain with the union they sought to escape, at least for a limited time, was thought to be the most appropriate method.
 
 
 49
 Weighing the efficacy of alternative approaches, and drawing upon past experience to guide the choice between them, are inherent in the Board's remedial powers. It is the Board, not the courts, which is authorized to make these judgments. See NLRB v. Seven-Up Bottling Co., supra; Phelps Dodge Corp. v. NLRB, supra. Thus, it cannot be said that the Board's present action is unrelated to the purposes of the Act. The order prevents petitioners from successfully evading their duty to bargain with the union. I cannot agree with the majority that that conclusion was so misplaced as to warrant the substitution of judicial judgment. The remedy here prescribed is not, in its precise factual context, a "patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 216, 85 S.Ct. at 406; NLRB v. Seven-Up Bottling Co., supra, 344 at 347, 73 S.Ct. 287; Virginia Elec. & Power Co. v. NLRB, 319 U.S. 533, 540, 63 S.Ct. 1214, 87 L.Ed. 1568 (1943).
 
 
 50
 It seems equally clear that the order has not been fashioned in such disregard for the circumstances of this case as to be oppressive. See NLRB v. Seven-Up Bottling Co., supra, 344 U.S. at 349, 73 S.Ct. 287. Cf. Republic Steel Corp. v. NLRB, 311 U.S. 7, 61 S.Ct. 77, 85 L.Ed. 6 (1940). The Board has weighed the interests of the new Florida employees in being free from a bargaining representative not of their choosing. In deference to this interest and to accommodate the conflicting policies of the statute, the Board relaxed its customary contract bar rules. Petitioners argue that the Board's order unduly interferes with the rights of their new employees. But the Board, as the agency entrusted with the task of permanently protecting these rights, is perhaps in a better position to assess the impact of this temporary limitation than an employer who relies on those rights to preserve the benefits of its unfair labor practices.[7] The order took into account the interests of the new employees; it was devised with careful reference to the circumstances at which it was directed; and it was "not intended to fix a permanent bargaining relationship without regard to new situations that may develop." Franks Bros. Co. v. NLRB, supra, 321 U.S. at 705, 64 S.Ct. at 819.
 
 
 51
 That the Board, in striking a balance between the need to protect a collective bargaining relationship and the interests of new employees in being free to select their own bargaining agent, has determined to give precedence to the former is, in my view, a judgment consistent with its statutory responsibilities. "It is not for us to weigh [the] * * * countervailing considerations." NLRB v. Seven-Up Bottling Co., supra, 344 U.S. at 348, 73 S.Ct. at 289. It is the Board's task to employ its acquired expertise in applying the broad policies of the Act to the various situations which may arise. Translating these policies into practical application, with due regard for accommodating their frequently competing implications, necessarily involves exercising a broad discretion. Our task ends when we have determined that that discretion has been exercised within the range of Congress' mandate to the Board "to effectuate the purposes of the Act." Under the circumstances of this case, I cannot say that the present order bears such a strained relationship to the policies of the Act that the Board exceeded its grant of discretion in adopting it.
 
 
 52
 The attacks on the remedy devised in this instance have been largely directed at its effectiveness. Garwin urges that the Board's prior policy is sufficient to repair whatever unfair labor practices it may have committed; and the union argues that neither the past policy nor the present order is a strong enough antidote for the violations shown on this record. Determinations of this nature are, however, peculiarly for the Board to make. "[T]he relation of remedy to policy is peculiarly a matter for administrative competence." Phelps Dodge Corp. v. NLRB, supra, 313 U.S. at 194, 61 S.Ct. at 852. One of the essential conditions for the development of such competence is latitude for the Board in living with its problems, and in fashioning new and changing responses to them as they reappear in altered guise. Here the Board has felt it necessary to enlarge somewhat the remedy it has been applying, in order to make sure that a bargaining relationship cannot blithely be cast aside because the back pay award happens to be, in the specific context, a toothless sanction. The Board has not thought it necessary to go the whole way of ordering the employer to move back, as the union insists it must do.
 
 
 53
 It must be recognized that the Board is operating in an area where the facts are as various as the mind of man, and where the Board, if it is to mediate between clashing interests with moderation and restraint, must have scope for inventiveness and experiment. The remedy devised by the Board on this record is not beyond the statutory pale. Its appropriateness under the circumstances, then, rests in the Board's judgment and not in this court's.
 
 
 
 Notes:
 
 
 [1]
 The Board has placed no time limitation on its order to bargain, as distinct from the one-year bar prescribed in respect of any agreement which may be reached in the bargaining. However, the order cannot be viewed as continuing the bargaining representation interminably. In respect of a similar order entered in Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1944), Mr. Justice Black, speaking for the Court, stated:
 Contrary to petitioner's suggestion, this remedy, as embodied in a Board order, does not involve any injustice to employees who may wish to substitute for the particular union some other bargaining agent or arrangement. For a Board order which requires an employer to bargain with a designated union is not intended to fix a permanent bargaining relationship without regard to new situations that may develop. * * But, as the remedy here in question recognizes, a bargaining relationship once rightfully established must be permitted to exist and function for a reasonable period in which it can be given a fair chance to succeed. * * * After such a reasonable period the Board may, in a proper proceeding and upon a proper showing, take steps in recognition of changed situations which might make appropriate changed bargaining relationships.
 321 U.S. at 705-706, 64 S.Ct. at 819.
 
 
 [2]
 Orders dealing with runaway shop problems are customarily phrased in alternatives. The employer is given the option of resuming business at his original location or of remaining at his new location. If the latter option is selected, prior Board doctrine called for imposing conditions similar to the ones recommended by the Trial Examiner in this case. The most relevant of these provisions for present purposes was that which conditioned a duty to recognize the union upon a showing that the employees transferring from the old plant and the new employees who wanted the union to represent them comprised a majority of the employees in the unit. But this provision was only applied when the employer illegally transferred his plant some distance from the original location. See Mount Hope Finishing Co., 106 N.L.R.B. 480 (1953), enforcement denied, 211 F.2d 365 (4th Cir. 1954); Brown Truck & Trailer Mfg. Co., 106 N.L.R.B. 999 (1953); Industrial Fabricating, Inc., 119 N.L.R.B. 162 (1957), enforcedsub nom., NLRB v. Mackenish, 272 F.2d 184 (6th Cir. 1959) (per curiam); Sidele Fashions, Inc., 133 N.L.R.B. 547 (1961), enforced sub nom., Philadelphia Dress Joint Board, International Ladies' Garment Workers' Union v. NLRB, 305 F.2d 825 (3d Cir. 1962). When the relocation was near the original plant, the Board assumed that a majority of the employees would have transferred had it not been for the employer's unfair labor practices. California Footwear Co., 114 N.L.R.B. 765 (1955), enforced in part sub nom., NLRB v. Lewis, 246 F.2d 886 (9th Cir. 1957). Earlier Board practice, however, seemed to indicate that an employer would be required to bargain with the union regardless of the distance of the move. Compare Mount Hope Finishing Co., supra, with Rome Products Co., 77 N.L.R.B. 1217 (1948) and with New Madrid Mfg. Co., 104 N.L.R.B. 117 (1953), modified, 215 F.2d 908 (8th Cir. 1954).
 
 
 [3]
 The Board noted that in this case the Florida operation was started from scratch and with a work force newly hired in Florida. Thus it could be said that these jobs, and the statutory protections which accrued to them, owed their very being to (1) Garwin's unfair labor practices, (2) the Board's unwillingness to order the plant to be returned to New York, and (3) the failure of the discharged New York employees to displace the Florida employees. "On balance, [the Board concluded], (the latter's) interests must yield to the statutory objective of fashioning a meaningful remedy for the unfair labor practices found."
 
 
 [4]
 Petitioners do not challenge that part of the order which would require them to bargain with the union, without regard for its majority status, if they resume operations in New York. The cases seem to foreclose any such contention. Having dissipated the union majority by their unfair labor practices, they may properly be prevented from retaining the benefits of such conduct. See,e. g., Franks Bros. Co. v. NLRB, 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020 (1943).
 
 
 [5]
 See also NLRB v. International Union, Progressive Mine Workers, 375 U.S. 396, 84 S.Ct. 453, 11 L.Ed.2d 412 (1963); NLRB v. Katz, 369 U.S. 736, 748 n. 16, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962); NLRB v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380 (1942); Sakrete of Northern Cal., Inc. v. NLRB, 332 F.2d 902, 909 (9th Cir. 1964), cert. denied, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965); NLRB v. Philamon Lab., Inc., 298 F.2d 176, 182-183 (2d Cir.), cert. denied, 370 U.S. 919, 82 S.Ct. 1555, 8 L.Ed.2d 498 (1962); NLRB v. J. C. Hamilton Co., 220 F.2d 492 (10th Cir. 1955); NLRB v. Geigy Co., 211 F.2d 553, 558-559 (9th Cir.), cert. denied, 348 U.S. 821, 75 S.Ct. 33, 99 L.Ed. 647 (1954); Joy Silk Mills, Inc. v. NLRB, 87 U.S. App.D.C. 360, 185 F.2d 732, 744-745 (1950), cert. denied, 341 U.S. 914, 71 S. Ct. 734, 95 L.Ed. 1350 (1951); NLRB v. Andrew Jergens Co., 175 F.2d 130, 134-135 (9th Cir.), cert. denied, 338 U.S. 827, 70 S.Ct. 76, 94 L.Ed. 503 (1949)
 
 
 [6]
 See,e. g., Schieber Millinery Co., 26 N.L. R.B. 937, modified by consent, 116 F.2d 281 (8th Cir. 1940). Nevertheless, so far as I can determine, this is the first instance when a bargaining order of this nature has been challenged on review. I do not consider NLRB v. Rapid Bindery, Inc., 293 F.2d 170 (2d Cir. 1961), on which petitioners and the majority rely, as dispositive. The court there was concerned with a plant relocation which was motivated by economic reasons, not by hostility to the union or a desire to escape collective bargaining.
 
 
 [7]
 Cf. Brooks v. NLRB, 348 U.S. 96, 103, 75 S.Ct. 176, 181, 99 L.Ed. 125 (1954): "The underlying purpose of this statute is industrial peace. To allow employers to rely on employees' rights in refusing to bargain with the formally designated union is not conducive to that end, it is inimical to it."