463 F.2d 907
 80 L.R.R.M. (BNA) 2716, 150 U.S.App.D.C. 71,
68 Lab.Cas. P 12,751
 INTERNATIONAL LADIES' GARMENT WORKERS UNION, AFL-CIO, Petitioner,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
McLOUGHLIN MANUFACTURING CORPORATION et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, International
Ladies' Garment Workers Union, Intervenor.
 Nos. 71-1159, 71-1328.
 United States Court of Appeals,
 District of Columbia Circuit.
 Argued April 13, 1972.
Decided June 8, 1972.
 
 Mr. Bernard Dunau, Washington, D. C., with whom Mr. Morris P. Glushien, New York City, was on the brief, for petitioner in No. 71-1159 and intervenor in No. 71-1328.
 Mr. Earl D. Yaffe, Chicago, Ill., for petitioners in No. 71-1328.
 Mr. John H. Ferguson, Atty., N. L. R. B., with whom Mr. Marcel Mallet-Prevost, Asst. Gen. Counsel, and Mrs. Nancy M. Sherman, Atty., N. L. R. B., were on the brief, for respondent.
 Before WRIGHT, McGOWAN and ROBINSON, Circuit Judges.
 J. SKELLY WRIGHT, Circuit Judge:
 
 
 1
 In this consolidated statutory review proceeding under the National Labor Relations Act,[1] McLoughlin Manufacturing Corporation asks us to upset a finding of the National Labor Relations Board that the company violated Section 8(a) (5) and (1) of the Act, 29 U.S.C. Sec. 158(a) (5) and (1), by failing to bargain with the union with respect to its decision to relocate its plant and the rights of its former employees flowing from that decision. The union challenges the Board's finding that the relocation was not "discriminatorily motivated" and therefore not a violation of Section 8(a) (3), 29 U.S.C. Sec. 158(a) (3). Finally, both the union and the company attack various aspects of the Board's order. For reasons given below, we affirm the Board's finding as to the substantive violations and grant the Board's cross-application for enforcement of its order as modified by our decision today.
 
 
 2
 * McLoughlin Manufacturing Corporation is a privately held corporation engaged in the manufacture and sale of women's blouses and other sportswear. J. Sidney Smith, Walter Eckerling and Sydelle Schlifke are the sole stockholders, officers and directors of the company.[2] Until August 31, 1965, McLoughlin operated out of an antiquated plant in Peru, Indiana. Throughout its existence the company maintained a narrow profit margin, and in the 11 years between its inception in 1954 and August 31, 1965, no dividends were declared. Smith and Eckerling, who devoted their full time to managing the business, received annual salaries of $13,000.
 
 
 3
 The International Ladies' Garment Workers Union was the collective bargaining representative of McLoughlin's production employees from 1954 through August 31, 1965. Until the events leading up to the instant controversy in 1965, there was no evidence of any overt hostility to the union or of opposition to the employees' exercise of their statutory rights. (D&O 3.) In 1962, after a one-day strike, the union obtained a three-year agreement providing for gradual adoption of a 35-hour work week. In addition, this agreement contained a seniority provision governing layoffs which, together with the reduction in the work week, caused severe hardship to the company.[3] As a result, on March 4, 1964, during the term of the 1962 agreement, Eckerling wrote the union requesting modification of the 35-hour work week and the seniority provision. In this letter Eckerling described the company as "rapidly choking * * * to death" under its contract. (D&O 3; Co. Exh. 1a, p. 2.) On March 17, Eckerling met with Norbert Ceicil, the union's representative, who said that "when the contract expired * * * there would be the possibility of change" but that "it was not something that we could do" during the term of "an existing contract." (Tr. 136.)
 
 
 4
 On October 30, 1964, the union notified McLoughlin that the current contract would expire on January 1, 1965, and that it wished to meet at an early date for the purpose of negotiating a new agreement. At a meeting on November 17, 1964, the union presented McLoughlin with its proposals for a new contract, and the company responded that it would need time to consider them. Subsequently, at the end of November, Eckerling met with Ceicil in Chicago. Ceicil explained that the union was engaged in negotiations with the Garment Industries of Illinois, a trade association of which McLoughlin was not a member, and that he could entertain no proposals other than those he had made on November 17 until the association negotiations were completed. The parties met again on February 5, 1965. Eckerling suggested modifications of the seniority provision and stated that "due to business conditions" the company might be forced to discontinue "operations until we could get some sort of relief." (TXD 3; Tr. 237.) According to Eckerling, Ceicil then "exploded" and warned that unless Eckerling signed the union's proposed contract he was "through." (TXD 4; Tr. 238.) After further discussion, however, Ceicil agreed to reconsider the union proposals. On February 22, the union presented a set of reduced demands, but it still sought a wage increase and did not relent on the question of the seniority clause. The meeting therefore ended without the parties having reached any accommodation.
 
 
 5
 In either the latter part of February or the beginning of March 1965 Eckerling contacted Bernard Rosenthal, president of the Manufacturers and Contractors Service Corporation (MCS), to discuss the possible sale of McLoughlin as a going business. During the course of this discussion, Rosenthal informed Eckerling of the full range of MCS' services, including handling of arrangements for contracting out production and assisting companies to relocate. Eckerling and Rosenthal met again around March 10, at which time the possibility of moving McLoughlin to Uniontown, Alabama was actively discussed. Rosenthal explained that a labor survey was necessary to determine the suitability of Uniontown for the proposed move. Eckerling expressed a willingness "to look at" the Uniontown area and to be present at the survey. (TXD II 2-3; Tr. II 37-41.)
 
 
 6
 Thus on March 25-27 Eckerling, Smith and Rosenthal visited Uniontown to attend the labor survey. Also present, by prearrangement with Rosenthal, were Larry Malloy, president of William James Associates, Inc., and Philip Kantor, president of Philip Kantor Associates, Inc. Rosenthal had known Malloy and Kantor for "many years" and had frequently worked with them in relocating factories in the South.[4] Rosenthal, Kantor and Thomas R. Long, mayor of Uniontown, were instrumental in arranging the particular dates for the labor survey,[5] At which approximately 1,500 persons registered for employment. Smith was clearly "impressed" by the large turnout, and Rosenthal felt that "there was a much larger quantity of possible applicants than would be needed." (TXD II 4; Tr. II 56, 322.) During the survey, the parties inspected the premises of the Cannebrake Shoe Company factory to determine the suitability of the space available there to conduct McLoughlin's operations pending construction of a new plant. In addition, William James Associates presented McLoughlin's representatives with a letter of intent[6] and some concrete form of proposal for construction of a new factory for the company.[7]
 
 
 7
 On April 6, 1965, some ten days after the labor survey in Uniontown, McLoughlin held its final collective bargaining meeting with the union at the Peru plant. Eckerling began the meeting by announcing that the company was going out of business. He explained that no dividends had ever been paid on the shareholders' investment, that the company could no longer compete effectively in the garment industry, and that the shareholders wanted to get their money out while they still could.[8] Norbert Ceicil, the union's representative who had participated in the prior negotiations, expressed surprise at this announcement and inquired if there was anything the union could do to induce the company to change its decision. Eckerling replied in the negative, stating flatly that "this was an irreversible decision." (TXD 4; Tr. 114-115, 177, 261-262, 310.) He said that McLoughlin had already contacted a broker to put the business up for sale and that both he and Smith planned to accept positions with other companies. In response to a question as to why McLoughlin was still making sample garments if it was going out of business, Eckerling stated that he intended to use the samples in his own line in the future.[9] Ceicil then raised the topic of severance pay, and Smith promised he would take care of it because "he wanted the girls to have whatever they were entitled to." (TXD 5; Tr. 178.) Thus the meeting ended with no mention of the fact that McLoughlin was in reality considering a relocation to Uniontown and with the union having been misled into believing the company had made an "irreversible" decision to liquidate.
 
 
 8
 After its April 6 meeting with the union, McLoughlin began the process of actually closing its Peru plant. The company formulated a plan for completing the work in process and arranged to contract out certain orders so they could be completed within the time required by customers. As the employees completed the remaining work, McLoughlin gradually laid them off, and by June only about half the employees were still working. The company's manufacturing operations in Peru ceased entirely on August 31, 1965, and those employees who had not left previously were terminated.
 
 
 9
 Meanwhile, the clandestine plan to relocate in Uniontown continued. On April 8, Mayor Long visited the Peru plant in order to inspect McLoughlin's operations. On May 3, Mayor Long and the town council of Uniontown met in special session and adopted an ordinance authorizing the conduct of a municipal election at which the voters would ballot on the proposition whether or not to build and finance construction of a plant to be leased to McLoughlin. Some time prior to May 3, McLoughlin orally agreed with Mayor Long to move its plant to Uniontown. Nevertheless, in early June, in response to questioning by the union concerning severance pay, as at the April 6 meeting the company advised the union that it was liquidating and said nothing about its intention to relocate. Again, about the end of June Smith informed Ceicil that the Peru plant would close "very soon," but did not mention the fact that McLoughlin was in the process of moving its operations to Alabama.
 
 
 10
 On July 2, the owners[10] of McLoughlin formed Lady Jo, Inc., an Alabama corporation intended to serve as a manufacturing subsidiary of McLoughlin.[11] On July 7, McLoughlin began transporting its machinery to the Cannebrake Shoe Company factory, which was to serve as Lady Jo's temporary quarters in Uniontown until the new plant could be completed. The company hired its first employees in Uniontown on July 12,[12] and the next day the citizens of Uniontown voted to construct and finance a new plant to be leased to McLoughlin. The bonds which were to provide funds for this project were sold on December 13, 1965, and in February 1966 William James Associates commenced construction of the new plant pursuant to plans designed by Philip Kantor Associates as early as the previous June.
 
 
 11
 The union's first inkling of this relocation was its receipt in late July 1965 of a report from its auditor that McLoughlin might be operating in Uniontown. The union immediately ordered an investigation to determine the authenticity of this report, and in early September an organizer from the union's Southeastern Department reported that the company's plant had in fact been moved to Alabama. Shortly thereafter, Ceicil telephoned Smith in Uniontown, and Smith conceded that the plant had been relocated. Ceicil did not seek further bargaining, however, as to either the decision to relocate or the effect of that decision on the former employees. (D&O II 4; Tr. 122.)
 
 
 12
 The instant litigation was commenced by the union's filing of a Charge Against Employer on December 10, 1965. (G.C. Exh. 1(a).) On February 28, 1966, a complaint was filed against McLoughlin by the Board's regional director alleging, inter alia, that (1) the company had refused to bargain with the union over its decision to relocate and the effect of that decision in violation of Section 8(a) (5) of the Act; (2) the company had discriminatorily terminated the employment of its employees in violation of Section 8(a)(3); and (3) the company had interfered with the employees in the exercise of their rights in violation of Section 8(a)(1). (G.C. Exh. 1(c).) A hearing was held on these charges before a trial examiner on April 22, 1966.)
 
 
 13
 The principal witness at this hearing was Walter Eckerling. In a flagrant distortion of the facts, Eckerling testified that about April 1, 1965 he first contacted Rosenthal and, pursuant to oral permission from Smith and Mrs. Schlifke, put McLoughlin up for sale as a going business. (Tr. 46-47, 260-263, 287-289.) Rosenthal was unsuccessful in his efforts to find a buyer. (Tr. 52-53, 262-264.) In early June 1965, however, Rosenthal advised McLoughlin that Uniontown, Alabama, which had an adequate supply of labor, was offering attractive inducements in order to acquire new industry. (Tr. 56-57.) To look into this opportunity, Smith and Eckerling visited Uniontown in early June. (Tr. 63-64, 66.) Eckerling testified further that he had never been to Uniontown prior to June 1965. (Tr. 63-64.)
 
 
 14
 At the time of this hearing, neither the union nor the Board's general counsel had any knowledge that Eckerling's version of the facts was sheer fabrication. Thus, on the basis of Eckerling's uncontroverted testimony, the Board found that "in April 1965, [the company] decided to go out of business and close [its] plant in Peru, Indiana. [The company] so notified the Union and discussed both the decision and its impact upon unit employees. * * * However, in June 1965, [the company was] presented with an offer to locate [its] business at a new plant in Uniontown, Alabama. In accepting this offer, [the company] maintained [its] decision to close the Peru plant, but changed [its] overall business plan from liquidation to relocation." (D&O 2.) The Board therefore held that the failure to give the union notice and an opportunity to negotiate was "in the circumstances of this case" a mere "technical violation" not warranting a remedial order. (D&O 4-5.) The Board also concluded that the evidence was insufficient to establish that the move was "discriminatorily motivated," and accordingly dismissed the complaint.[13]
 
 
 15
 On August 15, 1967, the union petitioned this court to review the Board's order of dismissal. During the pendency of the review proceedings, however, and before adjudication of the merits, the court granted motions of both the Board and the union to remand the case to the Board so it might consider motions of the union and the general counsel requesting it to reopen the record to hear additional evidence.[14] On September 25, 1968, the Board granted the motions to reopen the record,[15] and additional testimony was heard before a trial examiner on February 17, 1969. At this supplemental hearing, the true facts concerning McLoughlin's relocation came to light for the first time. On the basis of the original and reopened record, the Board reaffirmed its finding that the company did not violate Section 8(a)(3) in transferring its operations to Alabama, but it did find that McLoughlin had violated Sections 8(a)(5) and (1) by failing to bargain with the union over its decision to relocate and the effect of that decision on its Indiana employees.[16] The Board's order, inter alia, requires the company, upon request, to bargain with the union about the effects of the transfer and to "[m]ake whole their former employees in the Peru, Indiana, unit for the period June 10, 1965, until September 1, 1965 * * * for any loss of earnings they may have suffered" within that period.[17] The case is now once again before this court.
 
 II
 
 16
 Section 8(a)(5) of the Act provides that it shall be an unfair labor practice for an employer "to refuse to bargain collectively with the representative of his employees * * *." The limits of this statutory duty to bargain are defined in Section 8(d), which requires the employer to "confer in good faith with respect to wages, hours, and other terms and conditions of employment * * *." Bargaining is mandatory only with regard to subjects which fall within this language,[18] and in construing Section 8(d) "in each case the interests of the employees and the purpose of the National Labor Relations Act * * * must be carefully balanced against the right of an employer to run his business." NLRB v. Royal Plating & Polishing Co., 3 Cir., 350 F.2d 191, 195 (1965).
 
 
 17
 In Fibreboard Paper Products Corp. v. NLRB, 379 U.S. 203, 215, 85 S.Ct. 398, 405, 13 L.Ed.2d 233 (1964), the Supreme Court, affirming decisions of the Board and this court,[19] held that "the replacement of employees in the existing bargaining unit with those of an independent contractor to do the same work under similar conditions of employment" was a mandatory subject of bargaining under Section 8(d). The employer in Fibreboard was concerned with the high costs of its maintenance operations and because the union in past bargaining had not "joined hands with management" in an effort to reduce costs, the employer decided unilaterally to contract out its maintenance work to a contractor who promised to achieve the desired economies by operating with a smaller work force, fewer fringe benefits and no overtime payments. Such replacement subcontracting, the Court observed, did not alter the employer's basic operation and involved no significant change in its capital structure. Moreover, the determinative issues--size of work force, fringe benefits and overtime payments--were "matters peculiarly suitable for resolution within the collective bargaining framework * * *." 379 U.S. at 213-214, 85 S.Ct. at 404. Accordingly, the Court concluded that to require the employer to bargain about such a decision "would not significantly abridge his freedom to manage the business," id. at 213, 85 S.Ct. at 404, and would afford the union "an opportunity to meet management's legitimate complaints * *." Id. at 214, 85 S.Ct. at 405.
 
 
 18
 Since Fibreboard, the doctrine enunciated in that decision has been applied, not only to replacement subcontracting, but also to analogous situations involving plant relocations. See, e.g., Weltronic Co. v. NLRB, 6 Cir., 419 F.2d 1120 (1969), cert. denied, 398 U.S. 938, 90 S. Ct. 1841, 26 L.Ed.2d 270 (1970); Plymouth Industries, Inc., 177 NLRB 607 (1969), enforced, 6 Cir., 435 F.2d 558 (1970) (per curiam); Garwin Corp.; S'Agaro, Inc., 153 NLRB 664, 665, 680 (1965), enforced in relevant part, sub nom. Local 57, ILGWU v. NLRB, 126 U.S.App.D.C. 81, 374 F.2d 295, cert. denied, 387 U.S. 942, 87 S.Ct. 2078, 18 L. Ed.2d 1328 (1967). Indeed, the facts presented in the instant controversy fall well within the principles announced in Fibreboard. As the Board found, and as the testimony of company officials makes clear, an important element in McLoughlin's decision to relocate in Alabama was its long-standing dissatisfaction with its labor costs, particularly the costs which flowed from the seniority clause in the collective bargaining agreement and the adoption of the 35-hour work week. (D&O 3; Tr. 51, 61-62, 252, 255, 261-262.) And although there undoubtedly were several purely "managerial" considerations at stake in the company's decision, the labor relations matters involved were sufficiently important to justify an attempt at reconciliation through bargaining.
 
 
 19
 Moreover, the company's decision to relocate did not alter the scope of the enterprise.[20] On the contrary, McLoughlin's business in Alabama is virtually identical with that formerly conducted in Indiana--the company continues to lease its premises, it manufactures the same products using the same machinery, its product is sold to the same customers, and the business is owned and managed by essentially the same persons as before.[21] Given this factual setting, the company's decision to relocate was a mandatory subject of bargaining within the meaning of Fibreboard, and McLoughlin was therefore obliged to afford its employees an opportunity to meet its legitimate complaints about labor costs before ousting them from their jobs.
 
 
 20
 The company clearly did not fulfill this obligation. On April 6, 1965, some ten days after the labor survey and at a time when McLoughlin was seriously considering a move to Uniontown, Eckerling advised the union that the company had made an "irreversible" decision to go out of business. On this false basis--that the owners of McLoughlin had a fixed resolve no longer to be entrepreneurs and intended to liquidate their investment--the company obtained the union's acquiescence in permanent elimination of unit jobs. Indeed, throughout the entire period of relocation the company failed to provide the union with notice of its true intentions. Thus, by engaging the union in sham discussion, McLoughlin acted in continuing disregard of its statutory responsibilities and failed entirely to test the union's willingness to make the concessions which might have saved unit jobs. "[A]lthough it is not possible to say whether a satisfactory solution could [have been] reached, national labor policy is founded upon the congressional determination that the chances are good enough to warrant subjecting such issues to the process of collective negotiation." Fibreboard, supra, 379 U.S. at 214, 85 S.Ct. at 404. The company's active concealment of its plans in this case is a direct affront to that policy.
 
 
 21
 Moreover, it is now well settled that, quite apart from its obligation to bargain over its decision to relocate, the company was under an independent duty to bargain over the effects of that decision. See, e. g., NLRB v. Transmarine Navigation Corp., 9 Cir., 380 F.2d 933, 939 (1967); NLRB v. Rapid Bindery, Inc., 2 Cir., 293 F.2d 170, 176 (1961); NLRB v. Lewis, 9 Cir., 246 F.2d 886, 887-888 (1957). The company argues, however, that since the union had an opportunity to and in fact did bargain about the effects of McLoughlin's "decision" to liquidate, there was no need to bargain also over the effects of relocation. We do not agree. An employer's financial position is, of course, a highly relevant factor in shaping bargaining demands. See, e. g., NLRB v. Truitt Manufacturing Co., 351 U.S. 149, 152, 76 S.Ct. 753, 100 L.Ed. 1027 (1956). The company's false claim that it was liquidating rather than merely relocating was, by its very nature, equivalent to giving the union false information about McLoughlin's financial capacity. As might be expected in these circumstances, the union's request for bargaining over the effects of liquidation was limited to what it was already entitled to, namely, severance pay and accrued vacation pay. (TXD 5; Tr. 121, 178.) It was McLoughlin's own lack of candor which caused these negotiations to proceed on a false basis and deterred the union from seeking to cushion the impact of relocation on the basis of a realistic understanding of the company's future prospects. We therefore find, as did the Board, that McLoughlin's failure to inform the union of its decision to relocate was necessarily also a failure to provide the union an adequate opportunity to bargain over the effects of that decision.
 
 
 22
 Even where the duty to bargain requires that an employer not make unilateral changes in employment conditions, however, "there [may] be circumstances which the Board could or should accept as excusing or justifying [such] unilateral action * * *." NLRB v. Katz, 369 U.S. 736, 748, 82 S.Ct. 1107, 1114, 8 L.Ed.2d 230 (1962). The company seeks here to invoke this "special circumstances" defense on the ground that Uniontown's offer to build a plant for the company was conditioned upon the company's hiring only local residents and that if McLoughlin had initiated bargaining on the subject of plant relocation or the transfer of employees it would have assured the failure of the project. This argument is clearly fallacious. Although Mayor Long strongly objected to the possibility that Indiana employees might transfer to Alabama, he expressed no concern whatever over bargaining generally. (Tr. II 368.) Moreover, it is almost certain that the topic of transfers would have played little or no role in the negotiations. According to the company's own evidence, jobs were plentiful in Peru, whereas Uniontown was stricken with one of the highest rates of unemployment in the entire nation. (Tr. 102-103; Tr. II 292-293.) Indeed, as the Board found, "[t]here was neither evidence nor any contention that any of the Indiana employees would have wished to transfer to the new plant in Uniontown, Alabama." (D&O 5.) This being so, we must reject the company's effort to invoke the "special circumstances" exception as a means to escape its obligations to its Indiana employees.
 
 
 23
 Finally, McLoughlin argues that the union waived its rights under the statute by failing to demand bargaining on its own initiative. It is well settled that when a union has sufficiently clear and timely notice of an employer's plan to relocate, close or subcontract and thereafter makes no protest or effort to bargain about the plan, it waives its right to complain that the employer acted in violation of Sections 8(a) (5) and (1). See, e. g., NLRB v. Spun-Jee Corp., 2 Cir., 385 F.2d 379, 383-384 (1967); U. S. Lingerie Corp., 170 NLRB 750, 751-752 (1968); White Consolidated Industries, Inc., 154 NLRB 1593, 1593 n. 1 (1965); Motoresearch Co. and Kems Corp., 138 NLRB 1490, 1493 (1962). In the present case the company does not and, of course, cannot contend that it gave the union timely notice of its decision to relocate. Rather, McLoughlin asserts that by late July 1965, at the time of the auditor's report, the union had learned on its own "all about what was happening in Union-town, Alabama."[22] This assertion is simply not supported by the evidence.
 
 
 24
 Norbert Ceicil, the union's bargaining representative, testified that the union's "first indication" of the company's move "was when our auditor came down to Peru from Chicago, at the end of July, and he got, evidently, definite information that such a plant was operating in Uniontown because of various facts he picked up in town here." (Tr. 123-124.) To confirm this report, the union ordered an investigation and in early September its Southeastern Department concluded that McLoughlin was in fact operating in Uniontown. (TXD 8; Tr. 122-124.) Thus Ceicil's testimony shows only that by piecing together various facts picked up in Peru, the union in late July reasonably suspected that McLoughlin was in the process of relocating rather than liquidating. It is clear, however, that mere suspicion or conjecture cannot take the place of notice where notice is required. See, e. g., NLRB v. Royal Plating & Polishing Co., supra, 350 F.2d at 195; NLRB v. Rapid Bindery, Inc., supra, 293 F.2d at 176.[23]
 
 
 25
 Moreover, even if we were to accept McLoughlin's argument that the union had sufficient notice to demand bargaining in late July, such notice would still fail to satisfy the timeliness requirement of the waiver defense. Notice, to be effective, must be given sufficiently in advance of actual implementation of a decision to allow reasonable scope for bargaining. See, e. g., NLRB v. Brown-Dunkin Co., 10 Cir., 287 F.2d 17, 20 (1961). Indeed, "[n]o genuine bargaining * * * can be conducted where [the] decision has already been made and implemented." Town & Country Manufacturing Co., 136 NLRB 1022, 1030 (1962), enforced, 5 Cir., 316 F.2d 846 (1963). Although meaningful negotiations might possibly have occurred prior to the first shipment of machinery to Uniontown on July 7 and the hiring of the first Alabama employees on July 12, once the Alabama plant was operating bargaining over the decision to relocate could hardly have been fruitful. Notice of a fait accompli is simply not the sort of timely notice upon which the waiver defense is predicated. See, e. g., Wayne Johnson, 155 NLRB 674, 680 (1965), enforced, 9 Cir., 368 F.2d 549 (1966). Thus the Board's finding that McLoughlin violated Sections 8(a) (5) and (1) of the Act must be, and is, affirmed.
 
 III
 
 26
 It has long been settled that an employer violates Section 8(a) (3) of the Act if he relocates his operation with a purpose to discriminate against his employees for their exercise of the right to organize and bargain collectively. See, e. g., Local 57, ILGWU v. NLRB, supra, 126 U.S.App.D.C. at 84, 374 F.2d at 298; Industrial Fabricating, Inc., 119 NLRB 162, 164-172 (1957), enforced, sub nom. NLRB v. Mackneish, 6 Cir., 272 F.2d 184 (1959) (per curiam). In the instant case, the Board found that McLoughlin's decision to relocate was not tainted by discriminatory motivation,[24] and that determination must be upheld unless it has no rational basis. See, e. g., Mississippi Valley Barge Line Co. v. United States, 292 U.S. 282, 286-287, 54 S.Ct. 692, 78 L.Ed. 1260 (1934); Amalgamated Clothing Workers v. NLRB, 124 U.S.App.D.C. 365, 378, 365 F.2d 898, 911 (1966); International Woodworkers v. NLRB, 105 U.S.App.D.C. 37, 39, 263 F.2d 483, 485 (1959). A reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 465, 95 L.Ed. 456 (1951). Given these standards, we find that the Board's conclusion that McLoughlin did not violate Section 8(a) (3) is supported by substantial evidence and we therefore affirm that conclusion.
 
 
 27
 McLoughlin's plant facilities in Peru consisted of a three-story building adjacent to a one-story building, and this layout caused much wasted motion in operations. The company's lease required it to make consistently heavy expenditures to keep the antiquated buildings in satisfactory condition.[25] In addition, dirt from a nearby foundry necessitated special efforts to prevent soiling of the mostly white and pastel goods. (D&O 2-3; TR 213-217, 273-275.)[26] McLoughlin responded to these plant-related cost pressures in various ways, including postponement of much needed repairs of its electrical wiring system and successful negotiation of reductions in the rental paid for its facilities. (Tr. 216-217, 273.) Chief among the company's financial problems, however, was the large turnover among its employees, due largely to the restrictive seniority provision in its 1962 collective bargaining agreement. In conjunction with the 35-hour work week, this provision caused McLoughlin to incur burdensome training and overtime expenses.[27] As a result of these and other factors, the company operated at a narrow profit margin, and in the 11 years between its inception in 1954 and August 31, 1965, no dividends were declared on the owners' $85,000 investment.[28] Thus, although McLoughlin "was not in financial difficulty when it terminated its [Indiana] operations,"[29] there clearly were substantial legitimate business considerations underlying its decision to relocate in Alabama.
 
 
 28
 Nevertheless, "the fact that the employer may have legitimate economic reasons for [his decision] does not absolve him of his conduct if violation of his employees' statutory rights was also a motivating reason." Garwin Corp.; S'Agaro, Inc., supra, 153 NLRB at 677; see, e. g., Mead & Mount Construction Co. v. NLRB, 8 Cir., 411 F.2d 1154, 1155-1156 (1969); NLRB v. Electric Steam Radiator Corp., 6 Cir., 321 F.2d 733, 738 (1963); NLRB v. Jamestown Sterling Corp., 2 Cir., 211 F.2d 725, 726 (1954). Here, however, the company recognized and bargained amicably with the union for approximately 11 years and, with the single exception of McLoughlin's failure to bargain over its decision to relocate, there is no evidence of any employer aversion either to collective bargaining or to the employees' exercise of their rights. (D&O 3.)
 
 
 29
 The situation here is therefore markedly different from the "runaway shop" cases in which Section 8(a) (3) violations have been found. In Garwin Corp.; S'Agaro Corp., supra, for example, the evidence not only showed that the company officials resented the whole process of consultation and bargaining, but also that the specific reason for the relocation was "to get out of the Union." 153 NLRB at 667, 679 n. 34. Similarly, in Industrial Fabricating, Inc., supra, the company's move was preceded by offers to "trade" increased benefits and continued operations in return for the employees' promise to abandon the union. In addition, the company expressed irritation with the union's "baseless" grievances, declared that it would decide itself what was a grievance, and even temporarily shut down its plant in an effort to stifle union complaints. Unlike the employers in Garwin and Industrial Fabricating, McLoughlin has manifested neither the resentment toward the collective bargaining process nor the determined purpose to avoid that process characteristic of "runaway shops."
 
 
 30
 Finally, the union maintains that the Board erred in its refusal to infer discriminatory motivation from the company's false representations to the union concerning its "irreversible" decision to go out of business. It is clear, however, that the company's failure to bargain over its decision to relocate, although violative of Section 8(a) (5), is not necessarily conclusive on the question whether the purpose of the move itself was discriminatory. See, e. g., McGregor Printing Corp., 163 NLRB 938 (1967); Ozark Trailers, Inc., 161 NLRB 561 (1966); Standard Handkerchief Co., Inc., 151 NLRB 15 (1965). The burden of proof on this question, it must be remembered, rests upon the Board's general counsel, not the employer.[30] And although the Board might conceivably have found that McLoughlin's nonfulfillment of its bargaining obligation was part of a scheme to rid itself of the union, such a finding certainly was not required on the record before it. Thus, in light of the legitimate economic reasons for relocation, and in the absence of any overriding evidence of anti-union animus, the Board's conclusion that McLoughlin's decision to move was nondiscriminatory must be affirmed.
 
 IV
 
 31
 The Board's order, inter alia, requires the company to "[m]ake whole [its] former employees in the Peru, Indiana, unit for the period June 10, 1965, until September 1, 1965 * * * for any loss of earnings they may have suffered" within that period. (D&O II 5.) McLoughlin asserts that this aspect of the order does not effectuate the policies of the Act. We do not agree. The core of the company's violation was its failure to provide the union an opportunity to bargain about its decision to relocate --a failure which caused unit employees to lose their jobs without the protection of good faith bargaining. The Board's order is clearly designed to compensate those employees who were terminated as a result of McLoughlin's unlawful unilateral action. (D&O II 4.) Moreover, the order seeks also to restore the status quo ante as far as practicable in the circumstances. Recognizing that meaningful bargaining over the company's decision to relocate is no longer feasible (D&O II 3-4), the Board's order attempts to recreate in some practical manner the situation that would have existed had the company afforded the union an adequate opportunity to bargain over effects. Thus the award of back pay is well suited to remedying the violations found and plainly involves no abuse of the "wide discretion traditionally accorded the Board in fashioning remedies." Teamsters Local Union No. 328 v. NLRB, 136 U.S.App.D.C. 106, 107, 419 F.2d 688, 689 (1969); see also Fibreboard Paper Products Corp. v. NLRB, supra, 379 U.S. at 215-216, 85 S.Ct. 398, 13 L.Ed.2d 233; Winn-Dixie Stores, Inc., 147 NLRB 788, 792 (1964), enforced in pertinent part, 5 Cir., 361 F.2d 512, 515, 517, cert. denied, 385 U.S. 935, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).
 
 
 32
 The union also challenges this aspect of the Board's order. Specifically, the union contends that the award of back pay should be modified to include all employees terminated after April 6, 1965, when the company falsely informed the union that it had made an "irreversible" decision to go out of business. The Board's decision to limit the effect of its order to only those employees laid off after June 10, 1965 was premised upon Section 10(b) of the Act, which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *." Since the union's Charge Against Employer was filed on December 10, 1965, the Board ruled that under Section 10(b) any violations occurring prior to June 10, 1965 were time barred. The union argues, however, that its failure to file a charge within six months of April 6, 1965 was due to the company's fraudulent concealment of its plans rather than to the union's lack of diligence, and that the time bar should therefore be tolled.
 
 
 33
 There can be no doubt that when a party "has been injured by fraud and 'remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered * * *."' Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946), quoting Bailey v. Glover, 88 U.S. (21 Wall.) 342, 348, 22 L.Ed. 636 (1874). Indeed, "[t]his equitable doctrine is read into every federal statute of limitation."[31] In the instant case, the company actively concealed from the union, not only its decision to relocate in Uniontown, but also the circumstances surrounding that decision. Thus, although the union was aware in early September 1965 that the move had taken place, it had no knowledge at that time that the company had been considering such a move as early as March, when the labor survey occurred.
 
 
 34
 At the initial hearing before the trial examiner, Eckerling testified falsely that McLoughlin had first learned of the possibility of relocating in Uniontown in June 1965, and the union, the Board's general counsel, the trial examiner, and the Board accepted this testimony as truthful. Indeed, the full extent of the company's fraud did not become apparent until August 31, 1967, after the Board's initial decision, when one of the union's appellate counsel, examining a lease agreement between McLoughlin and Uniontown executed October 14, 1965, noticed an obscure reference to "the proposal dated March 25, 1965 to the lessee [McLoughlin] from William James Associates, Inc. * * *." (G.C. Exh. 5, p. 8.) (Emphasis added.) On the basis of this clue, the union promptly instituted an investigation, and upon discovery of confirmatory evidence that Eckerling's testimony was patently false, it urged the Board's general counsel in mid-September[32] to move the Board to reopen the record to adduce the evidence of this additional fraud. (G.C. Exh. 8(e), pp. 7-9.) As a result of this action, the true circumstances of the relocation came to light at the trial examiner's supplemental hearing. Given these facts, this clearly would seem to be an appropriate case for invocation of the doctrine of fraudulent concealment to toll the Section 10(b) time bar.
 
 
 35
 Nevertheless, counsel for the Board maintains that since more than 16 months elapsed between the initial hearing, at which the lease agreement from which the clue was discerned was presented into evidence, and appellate counsel's discovery of the fraud, the union failed to exercise sufficient diligence to justify tolling of the statute. We cannot agree. At the time of the initial hearing, the union had no reason to suspect that Eckerling's testimony was false. Thus it would indeed have been surprising if the union had recognized immediately the import of an obscure phrasal reference in the 27-page, single-spaced, drily technical lease agreement which was executed long after the events in controversy had occurred.
 
 
 36
 Moreover, the lease agreement, it must be remembered, was available not only to the union, but also the Board's field examiners who investigated the charge, the Board's general counsel, the trial examiner who heard the case, and the Board members themselves. When a clue is passed over by so many competent individuals, the fair inference is that exercise of reasonable diligence does not assure its notice and that lack of such diligence is not the explanation for its nondiscernment. A more likely explanation is simply that the clue was sufficiently hidden so that it was capable of nondetection even given reasonable diligence. To be sure, once the clue is uncovered its significance seems patent and its discovery easy, but it is not a new phenomenon that the seemingly obvious becomes so only after its discovery has eluded a good many others. Hindsight does not convict these others of want of reasonable diligence.
 
 
 37
 We therefore conclude that the Board's back pay award should be modified to include all employees terminated after April 6, 1965, and as so modified we grant the Board's cross-application for enforcement of its order.
 
 
 38
 So ordered.
 
 
 
 [1]
 29 U.S.C. Sec. 151 et seq. (1970)
 
 
 [2]
 Smith, who owns 25% of the stock, is president of the company and is in charge of its production operations. Eckerling is vice president, owns 37 1/2% of the stock, and is in charge of sales. Mrs. Schlifke is the owner of 37 1/2% of the stock, but is not active in management. (Tr. 24-29.) The joint appendix is referenced as follows: "Tr. --" references are to the initial hearing conducted by the trial examiner in April 1966. "Tr. II --" references are to the supplemental hearing conducted in Feb. 1969. "TXD --" references are to the initial decision of the trial examiner, issued Aug. 1, 1966. "TXD II --" references are to the trial examiner's supplemental opinion, issued July 17, 1969. "D&O --" references are to the Board's initial decision and order, issued April 26, 1967 and reported at 164 NLRB 140 (1967). "D&O II --" references are to the Board's supplemental decision and order, dated June 1, 1970 and reported at 182 NLRB No. 139 (1970). Exhibits introduced at the hearings by the Board's general counsel, the company, and the union are designated "G. C. Exh. --," "Co. Exh. --," and "U. Exh. --" respectively
 
 
 [3]
 The seniority provision specified that if there was insufficient work for a full 5-day week for each employee, the work would be shared equally among the employees so long as each employee still had 4 days of work each week. If the work fell below the amount necessary to provide each employee with 4 days per week, however, the least senior employees would be laid off in order to maintain a 4-day week for the remaining employees. (G.C. Exh. 7, Art. IX Sec. 1, Art. X Secs. 1-2.) McLoughlin found that most employees whose layoff during slack periods was required by the contract quickly found employment elsewhere and hence were unavailable when McLoughlin needed them again. As a result, during its peak periods the company was required to work the senior employees at overtime rates and at the same time train new employees to operate its machines. (Tr. 220-222, 224-225; Co. Exh. 1a.) McLoughlin therefore suffered a high turnover of inexperienced employees--in order to maintain an average work force of 75, it hired 181 employees in 1962, 214 in 1963, 198 in 1964, and 102 through Aug. 1965. (D&O 3; Tr. 41, 44, 218-219, 224-225; Co. Exh. 1a; G.C. Exh. 6, p. 4.)
 
 
 [4]
 As early as Dec. 9, 1964, William James Associates signed an agreement with Uniontown in which it undertook to find suitable industry for the town in return for Uniontown's promise that William James Associates would be engaged to construct any factory which Uniontown and the industry might agree to build. (TXD II 3 n. 5; Tr. II 169-170, 191-192; U. Exh. 1.) Philip Kantor Associates, a firm of professional engineers, worked closely with William James Associates and designed the buildings which William James agreed to build. It was through these parties that Rosenthal first learned of the opportunities in Uniontown. (TXD II 3 n. 5.)
 
 
 [5]
 The survey, which was arranged in early Feb. 1965, was conducted by officials of the Alabama State Employment Service. According to Mayor Long, McLoughlin was not the only company interested in the survey--J. P. Harless & Co., a manufacturer of fire-fighting equipment, also had representatives in Uniontown. (TXD II 3; Tr. II 255-258, 370-371, 393.)
 
 
 [6]
 A letter of intent is routinely prepared by William James Associates for its projects and sets forth the inducements--such as a promise to donate land and to finance construction of a factory--which the town offers to encourage a company to relocate. (TXD II 4-5, 6 n. 15; Tr. II 152, 160-161, 167-168.) The parties to a letter of intent are William James Associates, the town, and the company. There was some confusion in the testimony as to whether McLoughlin had signed the letter of intent. The letter itself was subpoenaed, but the parties disclaimed any knowledge of its whereabouts. The trial examiner found it unnecessary to decide whether Eckerling or Smith had signed such a letter at the labor survey. (TXD II 6, 11 n. 24.)
 
 
 [7]
 McLoughlin's lease agreement with Uniontown, executed Oct. 14, 1965, states that the town agrees to build a factory for McLoughlin "substantially in accordance with the plans and specifications therefore [sic] prepared by Philip Kantor and Associates and the proposal dated March 25, 1965 to the lessee [McLoughlin] from William James Associates, Inc., of Memphis, Tennessee." (G.C. Exh. 5, p. 8.) (Emphasis added.) Although this proposal of March 25 was subpoenaed, the parties involved professed that they had no knowledge of its whereabouts. (TXD II 5; Tr. II 13-14, 80-84, 98-99, 151, 187-190, 205-206, 390-392, 415-416, 418.) The trial examiner found that the proposal was presented during the labor survey. (TXD II 5-6.)
 It is also noteworthy that only one week after the survey, on April 3, 1965, Mayor Long instructed his attorneys to prepare the formal documents requisite to the conduct of a special election to authorize construction and financing of a plant for McLoughlin. (TXD II 7; Tr. II 328-344; G.C. Exh. 16.)
 
 
 [8]
 Eckerling stated further that the building and the machinery were both leased and that the lease on the building expired Aug. 31, 1965. Smith added that the lease on the machinery would terminate on May 15, 1965. Ceicil then asked to examine the lease on the machinery. After confirming the expiration date of this document, Ceicil requested proof of McLoughlin's need to go out of business. Eckerling refused, stating that he had shown the union proof of the company's financial situation "three years ago" and the union had then been unresponsive. (TXD 5; Tr. 178, 257-258.)
 
 
 [9]
 One of the employees present asked if they should start looking for other jobs. Eckerling responded that the company had "30, possibly 45 more days work" before it would close the plant, and he was hopeful that a buyer could be found within that time. (TXD 5; Tr. 179, 193, 260.) He suggested that it would be to the employees' advantage if a purchaser could see the plant in operation. (Tr. 179, 193.)
 
 
 [10]
 In addition to Smith, Eckerling and Mrs. Schlifke, Norman Belgrade purchased a 20% interest in Lady Jo, Inc. Belgrade, one of the original owners of McLoughlin, suffered financial reverses in 1959 and sold his entire investment for a nominal sum to Eckerling and Mrs. Schlifke. Belgrade was offered the 20% interest in Lady Jo at a minimal price to allow him to recoup his loss from the earlier sale of his McLoughlin stock. (TXD 2, 7 n. 15.)
 
 
 [11]
 Lady Jo is solely a manufacturing operation, works for McLoughlin and in function if not in form is a subsidiary of McLoughlin. McLoughlin decides what Lady Jo will manufacture, it purchases all raw materials and furnishes them to Lady Jo without transfer of title, it leases the plant in which Lady Jo operates, it owns or leases all the machinery Lady Jo uses, and it ships and sells all the goods produced. (TXD 7-8; Tr. 43, 71-72, 79-81; G.C. Exh. 5.) McLoughlin's and Lady Jo's combined operations in Uniontown are simply a continuation of the manufacturing and sales operations formerly conducted by McLoughlin alone. Thus there can be no doubt that, as Eckerling himself conceded, McLoughlin simply relocated its "plant from Peru, Indiana, to Uniontown, Alabama." (TXD 7; G.C. Exh. 6, p. 13.) This being so, we agree with the Board's conclusion that this case involves a relocation rather than a complete or partial closing
 
 
 [12]
 By Jan. 1966 there was a full complement of 65 production and maintenance employees at work in McLoughlin's temporary quarters in Uniontown. (TXD 7.)
 
 
 [13]
 The Board reversed the decision of the trial examiner who, even though accepting Eckerling's story as true, found violations of Secs. 8(a) (1), (3) and (5)
 
 
 [14]
 On June 17, 1968, the Supreme Court denied the company's motion for leave to file a petition for a writ of mandamus and/or prohibition seeking to expunge this court's remand order. McLoughlin Manufacturing Corp. v. Wright, 392 U.S. 922, 88 S.Ct. 2326, 20 L.Ed.2d 1411 (1968)
 
 
 [15]
 The company contends that the Board erred in granting these motions to reopen the record. This issue has already been resolved in this court's prior decision to remand the case to the Board, and we find McLoughlin's present arguments to be so frivolous as not to warrant discussion
 
 
 [16]
 The Board therefore affirmed the trial examiner's supplemental decision that McLoughlin had violated Secs. 8(a) (1) and (5) of the Act, but reversed his conclusion that the company had also violated Sec. 8(a) (3)
 
 
 [17]
 D&O II 5. Sept. 1, 1965 was selected as the cutoff date of the back pay award because on that date the union had knowledge of McLoughlin's decision to relocate in Uniontown but did not seek bargaining with respect to either the decision or its effect. (D&O II 4.) Neither party challenges this aspect of the Board's order. The Board's choice of June 10, 1965 as the commencement date of the back pay award was premised upon Sec. 10(b) of the Act, 29 U.S.C. Sec. 160(b), which provides that "no complaint shall issue based upon any unfair labor practice occurring more than six months prior to the filing of the charge with the Board * * *." Since the union's charge against the employer was filed on Dec. 10, 1965, the Board ruled that any violations occurring prior to June 10, 1965 were time barred. The union attacks this aspect of the Board's order. See Part IV of this opinion
 
 
 [18]
 See, e. g., NLRB v. Wooster Division of Borg-Warner Corp., 356 U.S. 342, 349, 78 S.Ct. 718, 2 L.Ed.2d 823 (1958)
 
 
 [19]
 Fibreboard Paper Products Corp., 130 NLRB 1558 (1961), supplemental opinion, 138 NLRB 550 (1962), enforced, sub nom. East Bay Union of Machinists, Local 1304 v. NLRB, 116 U.S.App.D.C. 198, 322 F.2d 411 (1963)
 
 
 [20]
 Since McLoughlin clearly did not partially liquidate its investment in order to reduce its entrepreneurial risk, this case is readily distinguishable from those "partial closing" cases wherein some courts have held that such a "managerial decision" cannot violate Sec. 8(a) (5) unless there is also a violation of Sec. 8(a) (3). See, e. g., NLRB v. Adams Dairy, Inc., 8 Cir., 350 F.2d 108 (1965), cert. denied, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966); NLRB v. Royal Plating & Polishing Co., 3 Cir., 350 F.2d 191, 195-196 (1965); NLRB v. William J. Burns International Detective Agency, 8 Cir., 346 F.2d 897, 899-902 (1965)
 
 
 [21]
 See notes 10 & 11 supra
 
 
 [22]
 Brief for petitioners in No. 71-1328 at 28
 
 
 [23]
 We might add also that in the circumstances of this case the union cannot be faulted for investigating on its own the authenticity of the auditor's report rather than seeking immediate confirmation from the company. In view of the numerous previous assurances of McLoughlin that it intended to liquidate the business, information that the company was instead relocating quite naturally raised questions as to the company's candor. The union could therefore reasonably have believed that direct inquiry at that stage would have been futile. Cf. Zarn, Inc., 170 NLRB 1135 (1968)
 
 
 [24]
 See D&O 3; D&O II 2
 
 
 [25]
 In fiscal 1963, when its after-tax profit was $3,309, McLoughlin spent $3,550 on repairs and replacements. In fiscal 1965, with an after-tax profit of $5,215, the company spent $3,130 on repairs and replacements. (Co. Exh. 3f, 5f.)
 
 
 [26]
 The union's attempt to belittle the company's concern with its poor operating conditions on the ground that those conditions had long existed overlooks the fact that the lease of the company's plant was due to expire on Aug. 31, 1965. (Tr. 217-218.) Thus McLoughlin was faced with the decision whether to recommit itself to those same conditions. As the Board found, "[t]he time of negotiations for a new collective-bargaining contract was therefore appropriate for a decision as to continued operations." (D&O 2.)
 
 
 [27]
 See note 3 supra. The decision to relocate may, of course, be predicated upon legitimate considerations of labor costs without violating Sec. 8(a) (3). See, e. g., Fibreboard Paper Products Corp., supra note 19, cert. denied as to dismissal of Sec. 8(a) (3) allegations, 375 U.S. 963, 84 S.Ct. 490, 11 L.Ed.2d 413 (1964); McGregor Printing Corp., 163 NLRB 938, 939 (1967); Diaper Jean Manufacturing Co., 109 NLRB 1045, 1058, 1061-1063 (1954), enforced, sub nom. NLRB v. Tredway, 5 Cir., 222 F.2d 719 (1955) (per curiam). As we have already seen, however, where a decision to relocate in fact turns on considerations of labor costs, Sec. 8(a) (5) ordinarily requires that the employees be given notice and an opportunity to bargain about the decision before it is implemented
 
 
 [28]
 In 1965, for example, on sales of $800,987, McLoughlin had costs of $792,344 and an after-tax profit of only .6% of sales. (Co. Exh. 5e.) Considered in relation to the stockholders' investment of $85,000, the company's after-tax profit was only about 5%
 
 
 [29]
 TXD 10. This statement was based upon the fact that McLoughlin had operated at a slight profit in 1963-1965. Ibid
 
 
 [30]
 See, e. g., NLRB v. Cone Mills Corp., 4 Cir., 373 F.2d 595, 601 (1967), and cases cited therein; NLRB v. Murray Ohio Manufacturing Co., 6 Cir., 326 F.2d 509, 513 (1964); International Woodworkers v. NLRB, 104 U.S.App.D.C. 344, 345, 262 F.2d 233, 234 (1958)
 
 
 [31]
 Holmberg v. Armbrecht, 327 U.S. 392, 397, 66 S.Ct. 582, 585, 90 L.Ed. 743 (1946); see, e. g., Exploration Co. v. United States, 247 U.S. 435, 446-450, 38 S.Ct. 571, 62 L.Ed. 1200 (1918); Emmett v. Eastern Dispensary & Casualty Hospital, 130 U.S.App.D.C. 50, 56, 396 F.2d 931, 937 (1967); Westinghouse Electric Corp. v. City of Burlington, 122 U.S.App.D.C. 65, 67, 351 F.2d 762, 764 (1965); Searl v. Earll, 95 U.S.App.D.C. 151, 153-156, 221 F.2d 24, 26-29 (1954)
 
 
 [32]
 This is, of course, well within 6 months of the discovery of the clue in the lease agreement. In addition, both the Board and the union moved this court, within 6 months of Aug. 31, 1967, to remand the case to the Board so it might consider motions to reopen the record